## CITIZENS' SAVINGS BANK OF OWENSBORO v. OWENSBORO.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 669. Argued February 27, 28, 1899. — Decided April 3, 1899.

The questions raised by the eighth and ninth assignments of error, relating to alleged violations of the Fourteenth Amendment to the Constitution of the United States, are not presented by the record, and do not result by necessary intendment therefrom, and are therefore not considered by the court, under the well-settled rules that the attempt to raise a Federal question for the first time after a decision by the court of last resort of a State is too late ; and that where it is disclosed that an asserted Federal question was not presented to the state court, or called in any way to its attention, and where it is not necessarily involved in the decision of the state court, such question will not be considered by this court.

The mere grant for a designated time of an immunity from taxation does not take it out of the rule subjecting such grant to the general law retaining the power to amend or repeal, unless the granting act contain an express provision to that effect.

The act of the legislature of Kentucky of February 14, 1856, and the act of May 12, 1884, c. 1412, incorporating the Citizens' Savings Bank of Owensboro, and the act of May 17, 1886, commonly known as the Hewitt Act, and other acts referred to, did not create an irrevocable contract on the part of the State, protecting the bank from other taxation, and therefore the taxing law of Kentucky of November 11, 1892, c. 108, did not violate the contract clause of the Constitution of the United States.

THE case was argued with Nos. 148, 149, 150 and 151, the reports of which follow it.

*Mr. W. T. Ellis* for plaintiff in error.  *Mr. J. A. Dean* filed a brief for same.

*Mr. Chapeze Wathen* and *Mr. J. D. Atchison* for defendants in error.

MR. JUSTICE WHITE delivered the opinion of the court.

The plaintiff in error, the Citizens' Savings Bank of Owensboro, Kentucky, was created, by an act of the general assembly of the State of Kentucky, approved May 12, 1884, with authority to do a general banking business. The legislative charter provided that the corporation should exist for a period of thirty years from the date of the act, and in section 7 it was provided that on the first day of January in each year the bank should pay "into the state treasury, for the benefit of revenue proper, fifty cents on each one hundred dollars of stock held and paid for in said bank, which shall be in full of all tax and bonus thereon of every kind."

At the time this charter was granted there existed on the statute books of Kentucky a law, enacted February 14, 1856, 2 Rev. Stat. Ky. 121, providing as follows :

"SEC. 1. That all charters and grants of or to corporations, or amendments thereof, and all other statutes, shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed : *Provided,* That whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested.

\*        \*        \*        \*        \*

"SEC. 3. That the provisions of this act shall only apply to charters and acts of incorporation to be granted hereafter; and that this act shall take effect from its passage."

It would seem that from the date of its creation until the year 1886 the bank was called upon to pay only the taxes provided in the seventh section of its charter. In 1886 (Session Acts of Kentucky, 1885–6, pp. 140, 144 to 147, 201) the legislature of Kentucky adopted what is designated in the

briefs of counsel as the Hewitt Act, containing the following provisions as to the taxation of banks:

"SEC. 1. That shares of stock in state and national banks, and other institutions of loan or discount; and in all corporations required by law to be taxed on their capital stock, shall be taxed 75 cents on each share thereof, equal to $100, or on each $100 of stock therein owned by individuals, corporations or societies, and said banks, institutions and corporations shall, in addition, pay upon each $100 of so much of their surplus, undivided surplus, undivided profits or undivided accumulations as exceeds an amount equal to 10 per cent of their capital stock, which shall be in full of all tax, state, county and municipal.

  *   *   *   *   *

"SEC. 4. That each of said banks, institutions and corporations, by its corporate authority, with the consent of a majority in interest of a quorum of its stockholders, at a regular or called meeting thereof, may give its consent to the levying of said tax, and agree to pay the same as herein provided, and to waive and release all right under the act of Congress, or under the charters of the state banks, to a different mode or smaller rate of taxation, which consent or agreement to and with the State of Kentucky shall be evidenced by writing under the seal of such bank and delivered to the Governor of this Commonwealth; and upon such agreement and consent being delivered, and in consideration thereof, such bank and its shares of stock shall be exempt from all other taxation whatsoever so long as said tax shall be paid during the corporate existence of such banks.

"SEC. 5. The said bank may take the proceeding authorized by section 4 of this act at any time until the meeting of the next general assembly: *Provided*, They pay the tax provided in section 1 from the passage of this act.

"SEC. 6. This act shall be subject to the provisions of section eight (8), chapter sixty-eight (68), of the general statutes.

"SEC. 7. If any bank, state or national, shall fail or refuse to pay the tax imposed by this act, or shall fail or refuse to

make the consent and agreement as prescribed in section 4, the shares of stock of such bank, institution or corporation, and its surplus, undivided accumulations and undivided profits, shall be assessed as directed by section 2 of this act, and the taxes — state, county and municipal — shall be imposed, levied and collected upon the assessed shares, surplus, undivided profits, undivided accumulations, as is imposed on the assessed taxable property in the hands of individuals: *Provided,* That nothing herein contained shall be construed as exempting from taxation for county or municipal purposes any real estate or building owned and used by said banks or corporations for conducting their business, but the same may be taxed for county and municipal purposes as other real estate is taxed."

The Citizens' Savings Bank accepted the Hewitt Act in the mode provided, and thereafter paid the tax specified therein.

In 1891 Kentucky adopted a new constitution, which contained the following:

"SEC. 174. All property, whether owned by natural persons or corporations, shall be taxed in proportion to its value, unless exempted by this constitution; and all corporate property shall pay the same rate of taxation paid by individual property. Nothing in this constitution shall be construed to prevent the general assembly from providing for taxation based on income, licenses or franchises."

The State of Kentucky, in 1892, enacted a law providing, among other things, for the assessment and taxation by the State, counties and municipalities, of banking and other corporations. This law was in absolute conflict with the Hewitt Act, and by special provision as well as by necessary legal intendment operated, if the constitution had not already done so, to repeal the system of bank taxation established by the Hewitt Act. Without detailing the scheme of taxation created by the law of 1892, it suffices to say that it organized a State board whose duty it was to ascertain and fix the value of what was termed the franchises of banks and other corporations, referred to in the law, and upon the amount so fixed the general state tax was levied. It was besides made

the duty of the board to certify its valuation of the property or franchises to the proper county or municipality in which the corporation was located, so that the sum of this assessment might become the basis upon which the local taxes should be laid. The city of Owensboro, where the Citizens' Savings Bank was located, established by ordinances the rate of municipal taxes for the years 1893 and 1894, and the sum so fixed was assessed upon the valuation of the franchises or property of the bank which had been certified by the state board in claimed conformity to the statute of 1892. The bank refused to pay these taxes, and a levy was made by the tax collector upon some of its property, and garnishment process was also issued against several of its debtors. Thereupon this suit was commenced by a petition, on behalf of the bank, to enjoin the city of Owensboro and its tax collector from enforcing the taxes in question.

The averments of the petition, and of the amendments thereto — for it was twice amended — assailed the validity of the tax on several grounds, all of which are, substantially, included in the following summary:

First. That the board of state valuation had no power under the constitution and laws of the State to make an assessment for local taxation, and, if it had such power, had not exercised it lawfully, because the method of valuation pursued by it was so arbitrary as to cause its action to be void. Second. That no notice of the assessment had been given the officials, as required by the state law. Third. That the taxes violated the equality clause of the state constitution, because, by the method adopted in making the assessment, the property of the bank had been valued by a rule which caused it to be assessed at proportionately one third more than the sum assessed against other property in the city of Owensboro, and by one half more than the valuation at which the property of other taxpayers throughout the State was assessed. Fourth. That the taxes violated the state law and constitution, because based upon an assessment made by the state board, and not on an assessment made by the city, and that they were likewise illegal, because the levy of the tax predicated

upon the assessment, by the state board, was dehors the powers of the city of Owensboro under the state laws. Fifth. That the taxes moreover violated the equality clause of the state constitution, because as there were certain national banks doing business in the city of Owensboro, against whom the franchise tax provided by the state law could not be enforced, without a violation of the law of the United States, therefore these banks could not be taxed for the franchise tax, and not to tax them, whilst taxing the petitioner, would bring about inequality of taxation, and hence be a violation of the state constitution. Sixth. The taxes were expressly and particularly attacked on the ground that the Hewitt Act, and the acceptance of the terms thereof, constituted an irrevocable contract, between the State and the bank, exempting it from all taxation other than as specified in the Hewitt Act, and therefore that the revenue act of 1892 and the levy of the taxes in question by the city of Owensboro violated the contract rights of the bank, which were protected from impairment by the Constitution of the United States.

In further support of this ground the petition charged that at the time the Hewitt Act was passed the bank had an irrevocable contract arising from section 7 of its charter limiting taxation to the sum there specified, which right the bank had surrendered in consequence of the contract embodied in the Hewitt Act. It was averred that this surrender of its contract right to enjoy the limited taxation, conferred by its charter, was a valid consideration moving between the bank and the State, operating to cause the Hewitt Act to become a contract upon adequate consideration.

A preliminary injunction restraining the collection of the taxes was allowed. The city of Owensboro demurred to the petition and to the various amendments thereof, and, reserving its demurrers, answered traversing the averments of the original petition and the amendments thereto. Motions were made to dissolve the injunction. On these motions testimony was taken and the case was heard on the motions to dissolve, and on the demurrers. The trial court dissolved the injunction, sustained the demurrers, and dismissed the suit. On appeal to

the Court of Appeals of Kentucky the decree of the trial court was affirmed. 39 S. W. Rep. 1030.

The opinion of the Kentucky Court of Appeals contained not only the reasons applicable to the case we are now considering, but also such as were by it considered relevant to several other cases which, it would seem, were either heard by that court at the same time or were deemed by the court to present so many cognate questions as to enable it to embrace the several cases in one opinion. In so far as it related to this cause, the opinion fully examined and disposed of the question of contract and the issues consequent thereon. An application on behalf of the appellant was thereafter filed, styled "Petition for extension of opinion and reversal." This application, whilst declaring that the appellant could not assent to the conclusion of the court on the question of the existence of an irrevocable contract, protected from impairment by the Constitution of the United States, asked no rehearing on that subject. The grounds for rehearing, which were elaborately pressed, related solely to certain questions of law which it was argued the record presented, and which it was claimed depended on the state law and constitution. There was no contention that these issues involved the Constitution or laws of the United States.

All the assignments of error but the eighth and ninth relate to errors charged to have been committed by the court below in holding that there was no contract protected from impairment by the Constitution of the United States. The eighth assignment asserts that there was error in allowing a penalty for the non-payment of the taxes, because such penalty was by the state law imposed only upon corporations and not on other taxpayers, and therefore the state law violated the Fourteenth Amendment to the Constitution of the United States. The ninth assignment charges that there was error in holding the taxes to be valid because the property or franchise of the bank, on which the tax was levied, was assessed at its full value, whilst other taxpayers in the State were assessed at not more than seventy per cent of the value of their property, thus creating an inequality of taxation, equivalent to a denial of

the equal protection of the laws, in violation of the Fourteenth Amendment to the Constitution of the United States.

We at the outset dispose of the eighth and ninth assignments just referred to. The questions which they raise are not properly here for consideration. They are not presented by the record nor do they result by necessary intendment therefrom. Indeed they were excluded from the cause, as Federal questions, by the implications resulting from the pleadings. Whilst it was charged that the penalties were unlawful, there was no allegation that their enforcement would violate any Federal right. On the contrary, the petition and the amendments to it clearly placed the objection to the penalties on the ground that their enforcement would violate the state law and the state constitution. The distinction between the state right thus asserted and the Federal right was clearly made when the only Federal issue which was relied on, the impairment of the obligation of the contract, was alleged, for then it was plainly stated to depend upon a violation of the Constitution of the United States. Even after the opinion of the Court of Appeals was announced there was not a suggestion made in the petition for rehearing that a single Federal question was considered by the parties as arising except the one which the court had fully decided, and as to which it was expressly declared a rehearing was not prayed. The assignments of error in question therefore simply attempt to inject into the record a Federal question not lawfully therein found, never called to the attention of the state court by pleading or otherwise, and not necessarily arising for consideration in reviewing the judgment of the state court to which the writ of error is directed. But after a decision by the court of last resort of a State the attempt to raise a Federal question for the first time is too late. *Miller* v. *Texas,* 153 U. S. 535; *Loeber* v. *Schroeder,* 149 U. S. 580. It is also clear that where it is disclosed that an asserted Federal question was not presented to the state court or called in any way to its attention, and where it is not necessarily involved in the decision of the state court, such question will not be considered by this court. *Louisville & Nashville Railroad* v. *Louisville,* 166 U. S. 709; *Oxley Stave Co.* v. *Butler County,*

166 U. S. 648; *Kipley* v. *Illinois,* 170 U. S. 182; *Green Bay &
Mississippi Canal Co.* v. *Patten Paper Co.,* 172 U. S. 58; *Capital Bank* v. *Cadiz Bank,* 172 U. S. 425.   We therefore decline
to review the errors alleged in the eighth and ninth assignments, and passing their consideration are brought to the real
Federal controversy which arises on the record — that is, the
question of irrevocable contract.

The claim is that the Hewitt Act and its acceptance by the
banks constituted an irrevocable contract, although at the
time that act was passed there was a general statute of Kentucky reserving the right to repeal, alter or amend "all
charters or grants of or to corporations or amendments thereof and all statutes" passed subsequent thereto, and although
this general statute was expressly made a part of the Hewitt
Act by the sixth section thereof.   The wording of the sixth
section accomplishing this result is: "This act shall be subject to the provisions of section 8, chapter 68, of the general
statutes," the provision thus referred to being the general
law of 1856, reserving the power to repeal, alter or amend as
above.   When the proposition relied upon is plainly stated
and its import clearly apprehended, no reasoning is required
to demonstrate its unsoundness.   In effect, it is that the
contract was not subject to repeal, although the contract
itself in express terms declares that it should be so subject
at the will of the legislative authority.   The elementary rule
is that if at the time a corporation is chartered and given
either a commutation or exemption from taxation, there exists
a general statute reserving the legislative power to repeal,
alter or amend, the exemption or commutation from taxation
may be revoked without impairing the obligations of the
contract, because the reserved power deprives the contract
of its irrevocable character and submits it to legislative control.   The foundation of this rule is that a general statute
reserving the power to repeal, alter or amend is by implication read into a subsequent charter and prevents it from becoming irrevocable.   In a case like the one now considered,
where not only was there a general statute reserving the
power, but where such general law was made by unambiguous

language one of the provisions of the contract, of course the legislative power to repeal or amend is more patently obvious to the extent that that which is plainly expressed is always more evident than that which is to be deduced by a legal implication. In *Tomlinson* v. *Jessup*, 15 Wall. 454, in speaking of a contract exemption from taxation arising from a charter, and of the right to repeal the same springing from a general law, reserving the power to alter or amend, which existed at the time the charter was conferred, the court, through Mr. Justice Field, said (p. 459):

"Immunity from taxation, constituting in these cases a part of the contract with the Government, is, by the reservation of power such as is contained in the law of 1841, subject to be revoked equally with any other provision of the charter whenever the legislature may deem it expedient for the public interests that the revocation shall be made. The reservation affects the entire relation between the State and the corporation and places under legislative control all rights, privileges and immunities derived by its charter directly from the State."

In *Railroad Co.* v. *Maine*, 96 U. S. 499, 510, the question was as to the liability to taxation of a consolidated corporation which came into existence while a general statute was in force, providing that any act of incorporation subsequently passed might be amended, altered or repealed at the pleasure of the legislature, in the same manner as if an express provision to that effect were therein contained, unless there was in the act of incorporation an express limitation or provision to the contrary. The court said: "There was no limitation in the act authorizing the consolidation, which was the act of incorporation of the new company, upon the legislative power of amendment and alteration, and, of course, there was none upon the extent or mode of taxation which might be subsequently adopted. By the reservation in the law of 1831, which is to be considered as if embodied in that act, the State retained the power to alter it in all particulars constituting the grant to the new company formed under it, of corporate rights, privileges and immunities. The existence of

the corporation and its franchises and immunities, derived directly from the State, were thus kept under its control."

In *Louisville Water Company* v. *Clark*, 143 U. S. 1, 12, the corporation claimed that it had acquired under an act of the legislature of the State of Kentucky an exemption from taxation which could not be withdrawn by subsequent legislation without its consent. As the act granting the exemption was passed subsequent to the adoption by the general assembly of Kentucky of the act of 1856, (the general law which was in being when the Hewitt Act was adopted, and which was expressly made a part of alleged contract,) it was held that the exemption from taxation could be repealed without impairing the obligation of the contract. The court, through Mr. Justice Harlan, said : " In short, the immunity from taxation granted by the act of 1882 was accompanied with the condition — expressed in the act of 1856 and made part of every subsequent statute, when not otherwise expressly declared — that, by amendment or repeal of the former act, such immunity could be withdrawn. Any other interpretation of the act of 1856 would render it inoperative for the purposes for which, manifestly, it was enacted."

Again, in *Covington* v. *Kentucky*, 173 U. S. 231, 238, considering the same subject in a case which involved the application of the power reserved by the State of Kentucky, in the act of 1856, to repeal, alter or amend all grants or contracts made subsequent to that act, the court said, through Mr. Justice Harlan :

" There was in that act [that is, the one making the grant] no ' plainly expressed ' intent never to amend or repeal it. It is true that the legislature said that the reservoirs, machinery, pipes, mains and appurtenances, with the land upon which they were situated, should be forever exempt from state, county and city taxes. But such a provision falls short of a plain expression by the legislature that at no time would it exercise the reserved power of amending or repealing the act under which the property was acquired. The utmost that can be said is that it may be inferred from the terms in which the exemption was declared that the legislature had no purpose

at the time the act of 1886 was passed to withdraw the exemption from taxation; not that the power reserved would never be exerted, so far as taxation was concerned, if in the judgment of the legislature the public interest required that to be done. The power expressly reserved to amend or repeal a statute should not be frittered away by any construction of subsequent statutes based upon mere inference. Before a statute — particularly one relating to taxation — should be held to be irrepealable, or not subject to amendment, an intent not to repeal or amend must be so directly and unmistakably expressed as to leave no room for doubt; otherwise, the intent is not plainly expressed. It is not so expressed when the existence of the intent arises only from inference or conjecture."

The conclusions stated in these cases are but the expression of many other adjudged causes. *Railroad Company* v. *Georgia,* 98 U. S. 359, 365; *Hoge* v. *Railroad Company,* 99 U. S. 348, 353; *Sinking Fund cases,* 99 U. S. 700, 720; *Greenwood* v. *Freight Company,* 105 U. S. 13, 21; *Close* v. *Glenwood Cemetery,* 107 U. S. 466, 476; *Louisville Gas Company* v. *Citizens' Gas Company,* 115 U. S. 683, 696; *Gibbs* v. *Consolidated Gas Company,* 130 U. S. 396, 408; *Sioux City Street Railway* v. *Sioux City,* 138 U. S. 98, 108.

Undoubtedly in the *Bank Tax cases,* 97 Kentucky, 597, the Court of Appeals of Kentucky decided that the Hewitt law created an irrevocable contract, and that the general assembly of that State could not repeal, alter or amend it without impairing the obligations of the contract, despite the existence of the act of 1856, and despite the circumstance that that act was in express terms incorporated in and made part of the Hewitt law. But the reasoning by which the court reached this conclusion is directly in conflict with the settled line of decisions of this court just referred to, and the case has been specifically overruled by the opinion announced by the Kentucky Court of Appeals in the cause now under review. It is not and cannot be asserted that the *Bank Tax cases* were decided before the contract evidenced by the Hewitt law was accepted, hence it cannot be urged that such

decision entered into the consideration of the parties in form-
ing the contract. It is not pretended that the bank, whose
rights are here contested, was either a party or privy to the
*Bank Tax cases.* And even if such were the case, we must
not be understood as intimating that the construction of the
Hewitt Act, which was announced in the *Bank Tax cases,*
would be binding in controversies as to other taxes between
those who were parties or privies to those cases. On this
subject we expressly abstain from now intimating an opinion.
In determining whether, in any given case, a contract exists,
protected from impairment by the Constitution of the United
States, this court forms an independent judgment. As we
conclude that the decision in the *Bank Tax cases* above cited,
upon the question of contract, was not only in conflict with
the settled adjudications of this court, but also inconsistent
with sound principle, we will not adopt its conclusions.

It was earnestly argued that conceding the general rule to
be that a reserved power to repeal, alter or amend enters
into and forms a part of all subsequent legislative enactments,
nevertheless this case should not be controlled thereby, first,
because of peculiar conditions which it is asserted existed at
the time the Hewitt law was enacted, and, second, because
of the terms of the act of 1856 by which the power to repeal,
alter or amend was reserved. The conditions relied upon and
stated in argument as removing this case from the operation
of the general principle are as follows: When the Hewitt
law was enacted there existed much uncertainty as to the
power of the State of Kentucky to tax banks within its bor-
ders. There were banks claiming to be only subject to lim-
ited taxation because of charters enacted prior to the act of
1856. Again, there were other banks asserting a like right
because of charters adopted since 1856, but which, it was
said, were not dominated by that act. In consequence of
these pretensions on behalf of state banks which were then
undetermined, the national banks, organized in the State,
were insisting that they were subject only to the rate of
taxation to which the most favored state bank was liable,
because it was urged that to tax such banks at a higher rate

would be a discrimination in favor of these banks and against the national banks, which was forbidden by the law of the United States. To add to this complexity, it is said, the varying rate of local taxation was operating inequality among banks, and driving banking capital from the localities where the tax was highest, thus producing a public detriment. To assuage these difficulties and conflicts, to secure as to all banks, state and national, a uniform and higher rate of state taxation than that existing as to other property, it is asserted that the Hewitt law tendered to all banks a contract giving freedom from local burdens if a higher state tax was voluntarily paid. This must have been contemplated to be irrevocable, for otherwise the very object of the law could not have been accomplished. Conceding *arguendo* to the fullest degree the situation to have been as described, the conclusion sought to be deduced from it is wholly unsound, since it disregards the fact that the contract proposed and which was actually entered into contained an express reservation of the right to repeal, alter or amend. Indeed, the contention, when analyzed, amounts to this, that the plain letter of the contract should be disregarded upon the theory that the parties intended to make a different contract from that which they actually entered into. The distinction between the potentiality of a particular state of facts, for the purpose of preventing the implication of the reserved power to alter, amend or repeal, and the impotency of such facts to overcome the express and unambiguous provisions of the contract, at once demonstrate the confusion of thought involved in the contention. It was upon the distinction existing between the implication of the power to amend, alter or repeal, and its express statement in a contract, that the case of *New Jersey* v. *Yard*, 95 U. S. 104, proceeded, and that case is therefore wholly inapposite to the controversy here presented.

The argument predicated on what is said to be the peculiar language of the act of 1856 is this: That act, whilst reserving the right to amend or repeal " all charters and grants of or to corporations, or amendments thereof, and all other statutes," accompanied this reserved right with the restriction that it

should not be exercised where "a contrary intent be therein plainly expressed, (in the act creating the right,) provided, that whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested." The bank, it is asserted, had under its charter a right to be taxed only to a limited amount; and this, it is claimed, constituted a contract which was surrendered on the theory that the Hewitt law was irrevocable, and if it were not so, then there was no surrender of the right under the charter, and therefore it now exists. This contention, however, but states in another form the claims which we have already disposed of. The charter was conferred on the bank subsequent to the act of 1856, and the limit of taxation stated in the charter was therefore subordinated to that act and subject to the exercise of the power of amendment or repeal. True it is, in *Franklin County Court* v. *Deposit Bank of Frankfort* (June, 1888), 87 Kentucky, 370, 382, the Court of Appeals of Kentucky decided that a grant, after the act of 1856, of an exemption from taxation for a designated time, signified such a plain manifestation of the will of the legislature that the grant should not be subject to alteration or amendment, that the right so conferred was therefore not submitted to the paramount power of repeal or amendment reserved by the act of 1856. This decision, however, was rendered long after the enactment of the charter of the bank, whose rights are now before us, and has been expressly overruled, by the Court of Appeals, in the case which we are reviewing. The doctrine settled by the adjudications of this court is this: That the mere grant for a designated time of an immunity from taxation does not take it out of the rule subjecting such grant to the general law retaining the power to amend or repeal, unless the granting act contain an express provision to that effect. The doctrine on which the argument depends is that any grant for a designated time is by implication taken out of the general rule, even although there be no express provision to that end in the act making the grant.

The assertion that wherever it is stated in a legislative grant

or charter that it is to last for a given period of time, therefore such provision is a plain manifestation of the intention of the legislature that the grant or charter shall not be repealed or amended for the time for which it was declared that it should exist, is fallacious, since it overlooks the consideration that the limit of time fixed for the duration of the charter or grant, like every other provision therein, is qualified by the reserved power to alter, amend or repeal. It hence results that where in a charter or grant enacted, when there is a general statute reserving the power to repeal, alter or amend, a time is stated, the granting act must be read just as if it declared that the charter or grant should exist for a designated time, unless sooner repealed, altered or amended. Indeed, reduced to its final analysis, the argument that because in a grant or charter a time is designated for its duration, it cannot, therefore, until the expiration of such time, be repealed, altered or amended, is equivalent to saying that the reserved power cannot be exercised in any case of contract. For, if every case of charter or grant where a time is fixed, either expressly or by necessary construction in the charter or grant, is taken out of the reach of the reserved power, it would follow that only those charters or grants which were determinable at will would come under the control of the power reserved. But to say this simply amounts to declaring that the reserved power applies and can be enforced only in those cases where it would be entirely unnecessary or useless to do so.

The source of the reservation, by many of the States in general laws, of the power to amend, alter or repeal, was fully reviewed in *Greenwood* v. *Freight Company*, 105 U. S. 13, where it was shown that such legislation had its origin in the purpose to provide for a case exactly like the one before us. Referring to the decision in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, the court, through Mr. Justice Miller, said (p. 20): "It was, no doubt, with a view to suggest a method by which the state legislatures could retain in a large measure this important power," (the power to repeal or amend,) "without violating the Federal Constitution, that Mr. Justice Story, in his concurring opinion in the *Dartmouth College*

*case*, suggested that when the legislature was enacting a charter for a corporation, a provision in the statute reserving to the legislature the right to amend or repeal it must be held to be a part of the contract itself, and the subsequent exercise of the right would be in accordance with the contract, and could not, therefore, impair its obligation. And he cites with approval the observations we have already quoted from the case of *Wales* v. *Stetson*, 2 Mass. 143. It would seem that the States were not slow to avail themselves of this suggestion. . . ." As then the limitation in the charter of the bank was subject to repeal by the legislature, it cannot be claimed that such exemption was vested in the bank, and was therefore subject to be reinstated if the Hewitt Act was not an irrevocable contract, even if the correctness of the claim that this result would legally arise, if the charter had been an irrevocable contract, be *arguendo* conceded.

It is urged that as the act of 1856 provides that other rights previously vested could not be taken away by the repealing act, therefore the exemption from taxation could not be withdrawn; but this is a mere form of restating the arguments already examined, and is tantamount to the reassertion of the proposition that the limited taxation established by the Hewitt Act, or the one conferred by the charter, could not be taken away at all. Referring to this subject, this court in *Greenwood* v. *Freight Company*, (*ubi supra*,) said (p. 17): "Such an act may be amended; that is, it may be changed by additions to its terms or by qualifications of the same. It may be altered by the same power, and it may be repealed. What is it that may be repealed? It is the act of incorporation. It is this organic law on which the corporate existence of the company depends which may be repealed, so that it shall cease to be a law; or the legislature may adopt the milder course of amending the law in matters which need amendment, or altering it when it needs substantial change. All this may be done at the pleasure of the legislature. That body need give no reason for its action in the matter. The validity of such action does not depend on the necessity for it or on the soundness of the reasons which prompted it." In

considering what constituted vested rights, the court clearly pointed out that rights of this character did not embrace mere privileges or franchises conferred by the granting act, and such rights obviously came within the power to repeal and amend, and were not within the category of those taken out of the reach of such power.

In the *Greenwood case* the reserved power was, by the general statute, authorized to be exercised "at the pleasure of the legislature." But this qualification was decided in *Hamilton Gas Light Company* v. *Hamilton City*, 146 U. S. 258, 271, to be no more comprehensive than the power which would be implied from a general law simply reserving the right to repeal, alter or amend.

Nor is there force in the claim that before the adoption of the charter in question the courts of the State of Kentucky had settled the law to be that vested rights would include a mere privilege conferred by the granting act, and which was therefore necessarily subjected to the power to repeal or amend if such power is to have any application at all. This claim is based on what is assumed to have been decided in Kentucky in *Commissioners of the Sinking Fund* v. *Green & Barren River Navigation Company*, 79 Kentucky, 73, 75, 83. The case has not the import attributed to it. The scope of the question in that case adjudged, was considered and commented on by this court in *Louisville Water Company* v. *Clark*, 143 U. S. 1, 16, where it was said:

"But there is nothing in that case inconsistent with the views we have expressed. It was there decided that the legislature could not consistently with the constitution, or with the above statute of 1856, take from the Green and Barren River Navigation Company, without making compensation therefor, the right it acquired under a contract with the State, concluded in 1868, to take, for a term of years, tolls from vessels navigating Green and Barren rivers, in consideration of its agreement, which had been fully performed, to maintain and keep in repair, at its own expense, such line of navigation. The case before us presents no such features. As already indicated, in losing an exemption from taxation the water com-

pany regained its rights to make such charges for water, furnished for fire protection, as it could rightfully have done before the act of 1882 was passed, and whilst its property was subject to taxation."

Finally, it is said that as at the time the Hewitt Act was passed the rate of state taxation was lower than the sum of taxation fixed by that act on the banks giving their assent to it, therefore this increased sum over and above the amount of state taxes paid by other taxpayers, to the State, constituted a consideration received by the State, and created a vested right of such a nature that the State could not repeal the Hewitt Act without providing for the refunding of the sum paid the State in excess of the state taxes paid by other taxpayers. But this disregards the patent fact that whilst the amount of the state taxes, paid by the bank under the Hewitt Act, was larger than the taxes paid by other taxpayers to the State, the bank was by the Hewitt Act relieved from all obligation to pay county and municipal taxes. As the bank had at the time of the Hewitt Act no contract limiting the taxing power of the State which could not have been repealed, it therefore could have been subjected by the State to the same rate of county and municipal taxes resting upon other taxpayers. It is not asserted that if this legislative power had been exerted and the bank been compelled to pay the same amount of taxation, for all governmental purposes, that other property owners were obliged to pay that it would not have contributed more than it was called upon to do under the Hewitt Act. The claim therefore amounts to this: That because the Hewitt Act relieved the bank from a part of the burden of taxation which rested upon the other taxpayers of the State, and this relief from burden was purely the result of the voluntary act of the lawmaker, that the power to remove the privilege cannot be exerted without refunding to the bank a portion of the lesser burden which it has paid. Thus to analyze the proposition is to answer it.

Our conclusion being that there was no irrevocable contract protecting the bank from taxation, and therefore that the taxing law of Kentucky did not violate the contract clause of

the Constitution of the United States, it follows that the decree below must be and it is

*Affirmed.*

·MR. JUSTICE BROWN dissenting.

The cogency with which the opinion of the court is ex‑ pressed is calculated to awaken a distrust as to the soundness of any conflicting views; but the very fact that the court to· which this writ of error was issued, only two years before the decree was pronounced which this court has affirmed, came to a ·precisely opposite conclusion upon the same state of facts, indicates at least that the question is not free from a rea‑ sonable doubt.    Indeed the judiciary of Kentucky appears to be about equally divided upon the subject.

The dominant question in the case is whether the written acceptance by the bank of the proposition contained in the act of 1886, known as the Hewitt Act, constituted a contract which neither the legislature nor the bank could repudiate at pleasure.    As stated in the opinion of the court,· the bank was chartered in 1884, with a provision that its life should continue for thirty years, and that a payment of fifty cents on each one hundred dollars of stock should "be in full of all tax and bonus thereon of every kind."    This charter fell un‑ der the provisions of the prior act of 1856, declaring that all such charters should be subject to amendment or repeal at the will of the legislature.    There seems, however, to have been some dispute as to whether, under the power to amend, it was within the competency of the legislature to increase this tax during the life of the charter, without a violation of the Fourteenth Amendment to the Federal Constitution.    To settle this question beyond peradventure, the legislature, in 1886, inaugurated a new policy, and in the Hewitt Act made a distinct proposition that, if the banks and corporations in‑ terested, with the consent of the majority in interest of their stockholders, at a regular meeting thereof, should ·give their consent to the levying of a tax of seventy-five cents on each share equal to one hundred dollars, and agree to pay the same as therein provided, and would agree to waive and release all

right under the act of Congress, or under their charters, to a different mode or smaller rate of taxation, and should evidence such consent by writing under the seal of the bank delivered to the Governor ·of the Commonwealth, "such bank and its shares of stock should be exempt from all other taxation whatever, so long as said tax shall be paid during the corporate existence of such bank." There ·was a further provision that, in case of refusal to enter into this compact, the bank should be assessed as directed by a previous section, and such state, county and municipal taxes imposed as were imposed on the assessed taxable property in the hands of individuals.

It is true that this act was made expressly subject to the prior act of 1856, declaring that all charters and grants to corporations should be subject to amendment or repeal at the will of the legislature; but this very act limited the power to repeal and amend to cases where a "contrary intent" was not "therein plainly expressed." In other words, that while such charters or grants were generally subject to amendment or repeal, if language were used by the legislature indicating clearly an intention that the privileges and franchises therein granted should not be subject to amendment or repeal, it was perfectly competent to do so, and the stipulation was binding. There was a further provision that no amendment or repeal should "impair other rights previously vested." How then could such intent to limit its own powers be manifested by the legislature? It will probably be conceded that, if the grant or charter contained a clause to the effect than any particular privilege therein granted should not be subject to amendment or repeal, it would be sufficient; but it seems to me equally clear that if it contained other language plainly evincing an intent that a particular clause should be irrepealable for a certain length of time; or, if it contained a proposition from which the legislature could not withdraw without a breach of faith toward those who had accepted its terms, it could not be intended that such contract, if accepted, should be subject to repudiation. Conceding to its fullest extent the doctrine of the *Dartmouth College case*, that the charter of

a corporation is a contract, it follows that so far as it is a charter it is, under the act of 1856, subject to amendment or repeal; but so far as the legislature departs from the main object of the charter of granting privileges and franchises, and invites its corporations to enter into written contracts with it, requires such contracts to be executed in an unusual form, and to receive the consent, not only of the directors but of a majority of its stockholders, and, further, that they be made under seal and delivered to the Governor of the Commonwealth, that then it evinces an intent as clearly as language can express it that such contract shall be binding, and that, in respect thereto, it yields up its right to amendment or repeal. *New Jersey* v. *Yard*, 95 U. S. 104. To hold that a contract thus solemnly entered into may be repudiated at the next session of the legislature is practically to say that the legislature may set a trap for its corporations, and that after it has enticed them into it by the offer of more favorable terms than they otherwise could obtain, may repudiate its own obligations, without restoring to the corporations what it had previously induced them to give up.

The difficulty with the position of the court is, that it renders it impossible for the Commonwealth to enter into a contract with one of its own corporations, which it may not repudiate at the next session of its legislature. If capital may be enticed into the State under its solemn promise that certain privileges shall be granted, or that it shall be subject to a certain specified rate of taxation, which may be withdrawn at any moment, it can scarcely complain if foreign capital refuses to be tempted by such illusory offers. I see no reason why, under the decision of the court, if the legislature should enter into a compact with one of its own corporations to perform a great public work, it may not, after capital has been largely invested therein, and the work entered upon, under the guise of amending the grant, abrogate its contract and leave the corporation practically defenceless. Indeed it seems to me that it is not creditable to the legislature to impute to it an intent to subject corporations, which had accepted the benefits of the Hewitt Act, to the rate of taxation prescribed by the act of 1892,

providing for wholly different modes of assessment and taxation, and that it is more reasonable to assume that the taxing officers of the city of Owensboro exceeded their authority in attempting to exact the taxes in question.

The cases cited in the opinion of the court are not in conflict with the position here assumed. In *Tomlinson* v. *Jessup*, 15 Wall. 454, it was decided that an act of the legislature of South Carolina, passed in 1851, incorporating the Northeastern Railroad Company, and a subsequent act passed in 1855, providing that its stock should be exempt from taxation during the continuance of the charter, were subservient to a general act passed in 1841, reserving the right to amend, alter or repeal every such charter, unless the act granting such charter should in express terms except it. As the amended charter in question contained no clause excepting it from the provisions of the general act of 1841, it was held that its property might be taxed by subsequent legislation. The case differs from the one under consideration in the fact that the amended charter contained no exception taking it out of the act of 1841, and that there was no express contract in that charter that no tax should be subsequently imposed. There was nothing to indicate that this charter was not intended to fall within the restrictions of the act of 1841.

In *Railroad Company* v. *Maine*, 96 U. S. 499, there was a similar general law, passed in 1831, declaring any act of incorporation liable to be amended, altered or repealed at the pleasure of the legislature, unless there was "an express limitation or provision to the contrary." It was held that an act of the legislature passed in 1856, authorizing corporations to consolidate and form a new corporation, was an act of incorporation of a new company, and, there being in this act no limitation upon the power of amendment, alteration and repeal, the State retained the power to alter it in all particulars, constituting the grant of corporate rights, privileges and immunities to the new company, and that a limitation upon the taxing power of the State prescribed in the charters of the old companies ceased upon their consolidation, though it was said that "rights and interests acquired by the company, not constituting a part of

the contract of incorporation, stand upon a different footing." In its application to this case it is subject to the samo criticism as that of *Tomlinson* v. *Jessup.*

The case of the *Louisville Water Company* v. *Clark*, 143 U. S. 1, arose under the same act of Kentucky of 1856. In that case, an immunity from taxation, conferred upon the water company by an act passed in 1882, was withdrawn by a subsequent act passed in 1886, and it was held that as the act of 1882 contained no clause that "plainly expressed" an intention not to exercise the power reserved by the statute of 1856 to amend or repeal, at the will of the legislature, all charters or grants to corporations, the act was subject to that general statute for the very reason that there was no " contrary intent" "plainly expressed." The opinion harmonizes completely with the position here assumed, and contains a clear inference that where a subsequent act plainly evinces an intention on the part of the legislature that the general statute of 1856 should not apply, such intention will be respected and will control the operation of the general statute. If the Hewitt Act does not evince such intention, of course the whole argument falls to the ground; but it seems to me that its language in this particular is too clear to be disregarded.

The recent case of *Covington* v. *Kentucky*, 173 U. S. 231, is of the same tenor. An act passed in 1886, authorizing the city of Covington to build a system of water works, contained a provision that they should " remain forever exempt from state, county and city tax." This was held to be subject to the act of 1856, providing for the amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed. It was very properly held that there was nothing in the act of 1886 plainly expressing an intent that the provision exempting the property from taxation was not subject to repeal; but the whole theory of this dissent is embodied in the proposition that there was in the Hewitt Act a plainly expressed intent that it should not be amended or repealed to the prejudice of banks accepting its terms. There was a plain intimation in that opinion that if the act of 1886 had contained evidence of such intent it would have been held to repeal the

act of 1856 to that extent. " Before a statute," said the court, — " particularly one relating to taxation, — should be held to be irrepealable, or not subject to amendment, an intent not to repeal or amend must be so directly and unmistakably expressed as to leave no room for doubt; otherwise the intent is not plainly expressed. It is not so expressed when the existence of the intent arises only from inference or conjecture."

. Such intent *was* found by this court in *New Jersey* v. *Yard,* 95 U. S. 104, in the fact that there was in the supplemental charter of the corporation, precisely as in the Hewitt Act, (1) a subject of dispute and fair adjustment of it for a valuable consideration on both sides; (2) the contract assumed, by legislative requirement, the shape of a formal written contract; (3) the terms of the contract, that "this tax shall be in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this State or any law thereof," excluded in view of the whole transaction, the right of the State to revoke it at pleasure. There was the same provision as in the Hewitt Act, that the section providing for a commutation of taxes should not go into effect, or be binding upon the company, until it had signified its assent under its corporate seal and filed it in the office of the secretary of State. The language of Mr. Justice Miller is so pertinent that I cannot forbear quoting the following paragraph: " Can it be believed that it was intended by either party to this contract that, after it was signed by both parties, one was bound forever, and the other only for a day? That it was intended to be a part of the contract that the State of New Jersey was, at her option, to be bound or not? That there was implied in it, when it was offered to the acceptance of the company, the right on the part of. the legislature to alter or amend it at pleasure? If the State intended to reserve this right, what necessity for asking the company to accept in such formal manner the terms of a contract which the State could at any time make to suit itself?" I find it difficult to see how that case and the one under consideration can stand together.

So far as the Court of Appeals of. Kentucky had spoken

upon this question, prior to the decision which is here affirmed, it was uniformly in favor of the position taken in this dissent. In *Franklin County Court* v. *Deposit Bank of Frankfort*, 87 Kentucky, 370, it was held that an act which continued the life of a charter to a period beyond the time fixed for its expiration, and reserved the corporate organization, privileges, powers, duties and rights, was an extension of an old charter, and not the grant of a new one; that an act passed in 1858, " plainly expressed " an intention that the act of 1856 should not apply to it, and that such intent was evinced by the provision that the appellee bank should establish a branch at Columbus; " that the amount of its circulation should not be greater than the amount of its capital stock actually paid in ; that it should, in addition to the fifty cents per share of its capital stock, pay annually fifty cents upon each one hundred dollars of its contingent fund; that it should be subject to all the limitations, conditions and duties imposed upon it by the act of incorporation; that it should formally accept the terms of extension."

I desire only to add that in *Commonwealth* v. *Farmers' Bank of Kentucky*, 97 Kentucky, 590, it was held, by the same majority of the court which subsequently overruled it, that there existed in the Hewitt Act " every element of a contract between the State and the banks and, with such a consideration as will uphold it, no reasonable doubt can be entertained that such was the purpose of the parties to it." " We are satisfied," said the court, " after a careful consideration of this question, that the parties making the contract never contemplated or intended that the act of 1856 should apply to this contract after its acceptance by the banks, and that such an acceptance was necessary to make the contract complete between the parties." The argument is a powerful demonstration of the existence of an irrevocable contract; but the Court of Appeals subsequently overruled this decision, and this court has affirmed its action, and in addition thereto has pronounced an opinion seemingly so inconsistent with *New Jersey* v. *Yard*, as to practically amount to an overruling of that case. These cases, however, are but a reaffirmance of a

principle which the same court had previously laid down in *Commissioners of Sinking Fund* v. *Green & Barren River Navigation Co.*, 79 Kentucky, 73, and *Commonwealth* v. *Owensboro &c. Railroad*, 95 Kentucky, 60, that a distinct contract contained in a charter was not subject to the act of 1856. Indeed, I do not understand upon what other theory a positive acceptance of the taxation imposed by the Hewitt Act was required of these banks.