**SOUTH CAROLINA POWER CO. v. SOUTH CAROLINA TAX COMMISSION et al.**

**BROAD RIVER POWER CO. v. QUERY et al., South Carolina Tax Commission.**

**LEXINGTON WATER POWER CO. v. SAME.**

No. 1634.

District Court, E. D. South Carolina.
Sept. 7, 1931.

516

Hagood, Rivers & Young, of Charleston, S. C., and Martin, Thompson & McWhorter, of Birmingham, Ala., for South Carolina Power Co.

Elliott, McLain, Wardlaw & Elliott, of Columbia, S. C., and Travis, Paxson, Wallace & Philbin, of New York City (W. C. McLain, of Columbia, S. C., and George M. LePine, of New York City, on the brief), for Broad River Power Co. and Lexington Water Power Co.

John M. Daniel, Atty. Gen. of South Carolina, and J. Fraser Lyon, of Columbia, S. C., for defendants.

Before PARKER and NORTHCOTT, Circuit Judges, and ERNEST F. COCHRAN, District Judge.

PARKER, Circuit Judge.

These are three independent suits instituted to enjoin the enforcement of the South Carolina statute imposing a tax on the production and sale of electric power. An interlocutory injunction is asked in each, and a court of three judges has been convened pursuant to section 266 of the Judicial Code (28 USCA § 380), and the cases have been heard together. Each suit involves an amount largely in excess of what is required for purposes of jurisdiction; and jurisdiction in equity is not controverted and unquestionably exists for the purpose of avoiding a multiplicity of suits.

The statute in question is entitled, "An Act to Raise Revenue for the Support of the State Government by the Imposition of an Excise Tax Upon Electric Power Generated and Sold Within This State" (Act S. C. May 9, 1931 [37 St. at Large, p. 357]); and the pertinent provisions thereof are as follows:

"Section 1. Be it enacted by the General Assembly of the State of South Carolina: (a) That in addition to all other taxes of every kind now imposed by law, every person, firm or corporation engaged in the business of manufacturing or generating hydroelectric power in the State of South Carolina shall be subject to the payment of an excise, license or privilege tax of five-tenths of one mill upon each kilowatt hour of hydro-electric power manufactured or generated, and said tax shall be paid to and collected by South Carolina Tax Commission.

"(b) That in addition to all other taxes of every kind now imposed by law, every person, firm or corporation engaged in the business of manufacturing or generating electric power by the use of steam power in the State of South Carolina shall be subject to the payment of an excise, license, or privilege tax of five-tenths of one mill upon each kilowatt hour of electric power so manufactured or generated and said tax shall be paid to and collected by South Carolina Tax Commission.

"(c) That in addition to all other taxes of every kind now imposed by law, every person, firm or corporation engaged in the business of selling electric power within the State of South Carolina shall be subject to the payment of an excise, license, or privilege tax of five-tenths of one mill upon each kilowatt hour of electric power sold in the State of South Carolina and said tax shall be paid to and collected by South Carolina Tax Commission: Provided, That if such seller procures electric power which has been subject to the payment of the excise, license or privilege tax hereinbefore provided a credit on said tax to the amount of the excise tax already required to be paid by the person, firm or corporation generating the same within this State shall be allowed: Provided, further, That the provisions of this Act shall not apply to the electric power manufactured or generated in another State and brought into this State until such power has lost its interstate character and immunities: Provided, further, That the provisions of this Act shall not apply to any person, firm or corporation owning and operating an electric manufacturing or generating plant of ten horse power or less, nor shall the provisions of this Act apply to industrial plants manufacturing or generating power for its own use, or for use upon its own premises by its bona fide operatives or employees but the tax shall be paid upon so much thereof as may be sold to other than its employees: Provided, further, That the provisions of this Act shall not apply to municipalities manufacturing or generating electricity for the use of its customers. * * *

"Section 6. For the year 1931 the revenue produced under this Act shall reduce the 1931 property levy for State purposes to the full amount raised under the terms of this Act: Provided, further, That for the year 1932 and thereafter, the revenue derived under the provisions of this Act shall be turned into the State Treasury for the support of the State Government."

The statute is attacked from different angles by the complainants in the various suits. The Broad River Power Company generates, sells, and uses current within the state of South Carolina; and it attacks both the production and the sales tax of the statute as being violative of the due process and equal protection clauses of the Fourteenth Amendment and similar provisions in the Constitution of South Carolina (article 1, § 5). The Lexington Power Company generates current within the state of South Carolina which is sold to another company and transmitted to other states; and it attacks the production tax as a burden upon interstate commerce as to current transmitted to other states, as well as being in violation of the Fourteenth Amendment and similar provisions of the South Carolina Constitution. The South Carolina Power Company, in addition to generating and selling current within the state of South Carolina, brings in from the state of Georgia current which it sells in South Carolina; and in addition to attack-

ing both the generation tax and the sales tax under the Fourteenth Amendment and the Constitution of South Carolina, it attacks the sales tax in so far as it affects electricity brought into the state for sale therein both as burdening interstate commerce and as discriminating against such commerce. The Lexington Power Company and the South Carolina Power Company, in addition to their other positions, contend that their power plants for the generation of electricity, which are maintained in navigable rivers under authority granted by the federal government, are agencies of the federal government in aid of navigation and are not subject to taxation at the hands of the state. The following questions, therefore, are raised by the cases before us: (1) Whether the statute violates the fundamental guaranties of due process and equal protection contained in the Fourteenth Amendment and in the Constitution of South Carolina; (2) whether it violates the commerce clause of the Constitution with respect to electric current generated within the state and transmitted to other states or with respect to current brought in from other states and sold within the state; and (3) whether it constitutes a burden upon a means or agency of the federal government with respect to those companies which are maintaining power plants in navigable streams under authority given them by Congress and the Federal Power Commission. We shall consider these questions in the order named.

### Questions under the Fourteenth Amendment and the Constitution of South Carolina.

Complainants contend that the statute amounts to a denial of due process and equal protection: (1) Because it does not tax generation of electricity by the use of oil or internal combustion engines and does not tax persons furnishing gas to the public for light, heat, or power; (2) because it exempts from its operation industrial plants generating power for their own use or the use of their employees, and municipalities generating electricity for the use of their customers; (3) because it exempts from the sales tax electric current upon which the generation tax has already been paid; (4) because it is said that the statute is indefinite and fails to provide means for determining the tax on current brought from without and sold within the state; and (5) because it is said that, as to the tax imposed for the year 1931, the statute taxes power companies for the benefit of persons paying the general property tax

levied by the state of South Carolina. None of these positions, we think, can be sustained.

As to the failure to tax gas companies and the generation of electricity by oil or the use of internal combustion engines, it is elementary that, in levying a tax, a state need not cover the whole field of possible taxation, but that it may classify for that purpose so long as the classification has a reasonable basis. State Board of Tax Com'rs of Indiana v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; Alward v. Johnson, 282 U. S. 509, 51 S. Ct. 273, 75 L. Ed. 496; Brown-Forman Co. v. Kentucky, 217 U. S. 563, 30 S. Ct. 578, 54 L. Ed. 883; Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232, 10 S. Ct. 533, 33 L. Ed. 892. If not palpably arbitrary the classification is valid. Metropolis Theater Co. v. Chicago, 228 U. S. 61, 62, 33 S. Ct. 441, 57 L. Ed. 730; Toyota v. Hawaii, 226 U. S. 184, 33 S. Ct. 47, 57 L. Ed. 180. And it is the duty of the court to sustain it if any state of facts can be conceived of upon which the classification may reasonably rest. Rast v. Van Deman & Lewis Co., 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Wampler v. Le Compte, 282 U. S. 172, 51 S. Ct. 92, 75 L. Ed. 276; State Board of Tax Commissioners of Indiana v. Jackson, supra, 283 U. S. 527, 51 S. Ct. 540, 543, 75 L. Ed. 1248, 73 A. L. R. 1464.

In the case last cited, which involved the Indiana chain store tax, the rule is thus stated by Mr. Justice Roberts: "The principles which govern the decision of this cause are well settled. The power of taxation is fundamental to the very existence of the government of the states. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws does not compel the adoption of an iron rule of equal taxation, nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations. Bell's Gap R. R. v. Pennsylvania, 134 U. S. 232, 10 S. Ct. 533, 33 L. Ed. 892; Southwestern Oil Co. v. Texas, 217 U. S. 114, 30 S. Ct. 496, 54 L. Ed. 688; Brown-Forman Co. v. Kentucky, 217 U. S. 563, 30 S. Ct. 578, 54 L. Ed. 883. The fact that a statute discriminates in favor of a certain class does not make it arbitrary, if the discrimination is founded upon a reasonable distinction, American Sugar Refining Co. v. Louisiana, 179 U. S. 89, 21 S. Ct. 43, 45 L. Ed. 102, or if any state of facts reasonably can

be conceived to sustain it. Rast v. Van Deman, 240 U. S. 342, 36 S. Ct. 370, 374, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455; Quong Wing v. Kirkendall, 223 U. S. 59, 32 S. Ct. 192, 56 L. Ed. 350. As was said in Brown-Forman Co. v. Kentucky, supra, at page 573 of 217 U. S., 30 S. Ct. 578, 580: 'A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses, or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.' "

The act before us cannot be said to be palpably arbitrary in that it does not tax the generation of electricity by the use of combustion engines, nor because it does not tax persons furnishing gas to the public for light, heat, and power. The business of producing and selling gas is so fundamentally different from the generation of electric power, that to point out the differences which might furnish a basis for the taxation of one and not the other is clearly unnecessary. The same is true of the production of electric current by the use of oil or internal combustion engines. The record shows that only two very small plants in the state of South Carolina are engaged in producing electricity in this manner; and, if the Legislature knew of their existence at all, it may well have determined that the volume of their business was so small and their relative cost of production so great as to put them in a class entirely different from the great power companies producing current from water power and coal. The purpose of the Legislature was evidently to tax the generation of electric current by the hydroelectric companies which utilize the water power in the rivers of South Carolina, one of the great natural resources of that state. The generation of current by the use of steam power was taxed because it is a matter of common knowledge that the hydroelectric companies use steam power to supplement water power in the production of their current, and also because current produced by steam power is the great competing factor on the market with current produced by water power. In so far as companies producing electric current by means of internal combustion engines may sell the current produced, they are not exempted from the tax imposed by the statute, but are reached by the sales tax imposed by subsection (c) of section 1. We do not regard this, however, as a matter of importance in sustaining the tax imposed by subsections (a) and (b); for we are satisfied that the classification of companies producing electricity by water power and steam for purposes of taxation is a reasonable one which must be sustained.

In Quong Wing v. Kirkendall, 223 U. S. 59, 32 S. Ct. 192, 56 L. Ed. 350, a statute was sustained which imposed a tax on hand laundries, but did not apply to steam laundries, and excepted from its operation laundries not employing more than two women. In Cargill Co. v. Minnesota, 180 U. S. 452, 21 S. Ct. 423, 45 L. Ed. 619, a statute was sustained which required warehouses situate on the right of way of a railroad to secure a license from a state commission but made no such requirement of other warehouses. In Armour Packing Co. v. Lacy, 200 U. S. 226, 26 S. Ct. 232, 50 L. Ed. 451, an occupation tax was sustained upon meat-packing houses which distributed their products from depots, although no such tax was imposed upon wholesalers and commission merchants. In Ohio River & W. R. Co. v. Dittey (Ohio Tax Cases) 232 U. S. 576, 34 S. Ct. 372, 58 L. Ed. 737, an excise tax upon the gross earnings of railway companies was upheld, although no such tax was placed on the earnings of other public utilities. In Puget Sound Power Co. v. King County, 264 U. S. 22, 44 S. Ct. 261, 68 L. Ed. 541, it was held that the property of a street railway company might be taxed upon a different basis from the property of steam railways. In Alaska Fish Salting Co. v. Smith, 255 U. S. 44, 41 S. Ct. 219, 65 L. Ed. 489, a tax was sustained upon the manufacture of fish oil, fertilizer, and fish meal from herring, although at a greater rate than was imposed upon similar use of other fish. In Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237, it was held that a tax on anthracite but not on bituminous coal did not violate the equal protection clause, and that the fact of commercial competition between the two did not prevent the state from classifying them separately for purposes of taxation. In the light of these decisions, a statute which taxes companies producing electric current by water power and steam, without taxing gas companies and the comparatively insignificant companies which produce current by the use of internal combustion engines, cannot be said to make an arbitrary classification which denies the equal protection of the laws.

■ Like reasoning applies to the contention that the statute denies the equal protection guaranteed by the Amendment, in that it exempts from the tax industrial plants generating power for the use of themselves and their employees, and municipalities generating electricity for the use of their customers. Such industrial plants and municipalities are manifestly in an entirely different class from power companies generating electricity for sale to the public. So far as the exemption extended to industrial plants is concerned, the case is clearly governed by American Sugar Refining Co. v. Louisiana, 179 U. S. 89, 21 S. Ct. 43, 45 L. Ed. 102, which dealt with a statute imposing a license tax upon persons refining sugar and molasses, but exempting from the tax "planters and farmers grinding and refining their own sugar and molasses." In sustaining the constitutionality of the statute, the court, speaking through Mr. Justice Brown, said: "The act in question does undoubtedly discriminate in favor of a certain class of refiners, but this discrimination, if founded upon a reasonable distinction in principle, is valid. Of course, if such discrimination were purely arbitrary, oppressive, or capricious, and made to depend upon differences of color, race, nativity, religious opinions, political affiliations, or other considerations having no possible connection with the duties of citizens as taxpayers, such exemption would be pure favoritism, and a denial of the equal protection of the laws to the less favored classes. But from time out of mind it has been the policy of this government, not only to classify for purposes of taxation, but to exempt producers from the taxation of the methods employed by them to put their products upon the market. The right to sell is clearly an incident to the right to manufacture or produce, and it is at least a question for the legislature to determine whether anything done to prepare a product most perfectly for the needs of the market shall not be treated as an incident to its growth or production."

Here the generation of electricity by manufacturers for the use of themselves and their employees is clearly no more than an incident of the business of manufacturing in which they are engaged and, both practically and theoretically, stands upon an entirely different footing from the generation of current for sale to the public. See also Armour & Co. v. Virginia, 246 U. S. 1, 38 S. Ct. 267, 62 L. Ed. 547, which sustained a taxing statute which imposed a tax on merchants based on the amount of their purchases, including as purchases all goods and merchandise manufactured by the licensee and sold or offered for sale within the state, but excluded from its operation domestic manufacturers, taxed on capital by the state, who offered for sale at the place of manufacture goods manufactured by themselves. In upholding this statute against the charge that it denied the equal protection guaranteed by the Fourteenth Amendment, Chief Justice White said that the distinction upon which the classification of the statute rested was so obvious as to require nothing more than a mere statement of the two classes. We think the same is true of the classification here.

■ So far as the exemption accorded municipalities is concerned, a municipality is an agency of the state, and its operations are conducted, not for private profit, but for the benefit of the public or its citizens. Irvine v. Town of Greenwood, 89 S. C. 511, 72 S. E. 228, 36 L. R. A. (N. S.) 363. Its property and business conducted by it are ordinarily not taxed at all; and legislation of the state taxing or exempting same from taxation is not open to the objection that it offends the equal protection clause of the Fourteenth Amendment. See Village of Hardwick v. Wolcott, 98 Vt. 343, 129 A. 159, 39 A. L. R. 1222 and note.

■ Our attention is called to section 4, article 10, of the Constitution of South Carolina, which provides that "there shall be exempted from taxation all county, township and municipal property used exclusively for public purposes and not for revenue"; and the argument is made that the Legislature, because of this provision, is without power to exempt from taxation the business of a municipal lighting or power plant operated for revenue. The constitutional provision in question, however, merely requires that the Legislature exempt from tax the property mentioned therein. There would seem to be nothing in it which would require the Legislature to impose an excise tax on the business operated by municipalities; and in the absence of a holding of the Supreme Court of South Carolina to that effect we cannot give it such construction. As we said in Doscher v. Query, 21 F.(2d) 521, 528: "The question as to whether the statute under consideration violates the Constitution of South Carolina has not been passed upon by the Supreme Court of that state; and federal courts are reluctant to adjudge a state statute to be in conflict with the state Constitution before that question has been considered by the state tribunals, especially where the

statute is one affecting the revenues of the state. Michigan Cent. R. Co. v. Powers, 201 U. S. 245, 291, 26 S. Ct. 459, 50 L. Ed. 744; Coulter v. Louisville & Nashville R. Co., 196 U. S. 599, 609, 25 S. Ct. 342, 49 L. Ed. 615. They will not do so unless the case 'imperatively demands such a decision.' Louisville & N. R. Co. v. Garrett, 231 U. S. 298, 305, 34 S. Ct. 48, 51, 58 L. Ed. 229."

 It is argued that the sales tax imposed by section (c) of the act violates the equal protection clause of the Federal Constitution and also the rule of uniformity prescribed by article 10, § 1, of the Constitution of South Carolina, because it exempts from the tax sales of current upon which the generation tax has already been paid. We think, however, that this point is entirely without merit. The evident purpose of the act is to impose a tax upon the current used within the state and to impose it at the source or as soon as the current becomes subject to the jurisdiction of the taxing power, but not to impose it but once. Cf. Texas Co. v. Brown, 258 U. S. 466, 479, 42 S. Ct. 375, 66 L. Ed. 721. If current produced as well as sold within the state were subjected to the sales tax, such current would rest under a double burden of taxation. To avoid this and at the same time to preserve the system of taxing at the source, current which is produced within the state is taxed at the time of generation but is relieved of the sales tax, which is equal in amount, with the result that all current sold within the state, whether produced there or brought in from another state, pays exactly the same tax. If there is any discrimination, it is in favor of the current brought in; for such current does not pay tax upon the "line loss," whereas the generation tax does not make provision for this loss. The situation is precisely that with which the Supreme Court dealt in Hinson v. Lott, 8 Wall. 148, 152, 19 L. Ed. 387. In that case the state of Alabama had levied a tax of 50 cents per gallon on all spirituous liquors manufactured within the state. A subsequent section of the act provided that dealers introducing such liquors into the state should, before offering same for sale, pay a similar tax upon every gallon thereof. What the Supreme Court said in answer to the contention that this constituted a burden upon and a discrimination against interstate commerce as to the liquor brought in answers equally the contention here that the exemption in favor of the current upon which the tax has been paid discriminates against the current brought in upon which it has not

been paid. Said the court: "A tax is imposed by the previous sections of the same act of fifty cents per gallon on all whiskey and all brandy from fruits manufactured in the State. In order to collect this tax, every distiller is compelled to take out a license and to make regular returns of the amount of distilled spirits manufactured by him. On this he pays fifty cents per gallon. So that when we come in the light of these earlier sections of the act, to examine the 13th, 14th, and 15th sections, it is found that no greater tax is laid on liquors brought into the State than on those manufactured within it. And it is clear that whereas collecting the tax of the distiller was supposed to be the most expedient mode of securing its payment, as to liquors manufactured within the State, the tax on those who sold liquors brought in from other States was only the complementary provision necessary to make the tax equal on all liquors sold in the State. As the effect of the act is such as we have described, and it institutes no legislation which discriminates against the products of sister States, but merely subjects them to the same rate of taxation which similar articles pay that are manufactured within the State, we do not see in it an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the States."

In Doscher v. Query, supra, 21 F.(2d) 521, 527, we dealt with a statute of South Carolina imposing a stamp tax on the sale of tobacco products within the state and requiring the affixing of stamps by manufacturers, wholesalers, and retailers, but providing that where stamps had been once affixed no further stamps should be required. The tax was assailed, just as is the tax here, on the ground that it discriminated against unstamped products brought into the state in favor of products produced within the state upon which the stamp tax had been paid by the producer. And there, just as here, the tax was attacked as violative of article 10, § 1, of the South Carolina Constitution, and the decision in Standard Oil Co. v. Spartanburg, 66 S. C. 37, 44 S. E. 377, was relied on. In upholding the validity of the statute, we said:

"It will be noted that the section [of the Constitution] relied on expressly authorizes graduated license taxes on occupations and business, and, if the tax in question be considered an occupation or business tax, graduation in accordance with sales would seem to be expressly authorized. If it be considered a tax on sales, there is nothing in the

section of the Constitution to invalidate any of its provisions, as it is undoubtedly made at a uniform and equal rate, levying the same tax on all articles of merchandise of the same sort sold within the state. The idea that the rule of uniformity is violated because only one tax is imposed on each article and only one stamp is required to be placed on it, even though it may have been sold a number of times, is not well grounded. It is a matter of common knowledge that a tax of this sort is shifted from dealer to dealer and is ultimately paid by the consumer, and we can think of no better way of securing uniformity in a sales tax than by imposing the tax on the article itself, as is in effect done in this case.

"The question here is very different from that involved in Standard Oil Co. v. Spartanburg, 66 S. C. 37, 44 S. E. 377, especially relied upon by complainants. There an ordinance of the city of Spartanburg imposed a flat license tax of $250 per year on dealers in oils, but exempted from paying the tax dealers handling oils on which the license had been paid. The Supreme Court of South Carolina held that the ordinance made an unreasonable classification, and was therefore void. But in that case the effect of the ordinance was to exempt from taxation dealers handling oils purchased from dealers who had themselves paid the flat license tax, the exemption applying not to the oil but to the dealer. Here no one is exempted from paying the tax imposed, but it is collected from the dealer or manufacturer who has the goods in possession prior to the first sale within the state. To provide that no one shall be required to pay an additional tax with respect to the sale of these particular goods, as to which we may safely assume that the tax paid is added to the price, is manifestly a very different thing from providing that retail dealers in oil shall be exempted from paying a flat annual license tax because they happen to purchase from a wholesaler who has paid the same tax."

It is next argued by the complainant South Carolina Power Company that the statute deprives it of property without due process of law, in that it fails to provide any certain means for determining the tax on current brought into the state. The statute provides that it shall not apply to electric power generated in another state and brought into South Carolina until such power has lost its interstate character; and the objection is that no means is provided for determining when the current loses its interstate character and becomes subject to the tax. In the light of the evidence as to how current is brought into South Carolina by the South Carolina Power Company, however, this objection loses all substance. The current comes into South Carolina in interstate commerce on high-tension wires at a voltage of 44,000 volts. All of it is used in South Carolina, but before it is used it is "stepped down" to a lower voltage and thus prepared for use in the state. As we shall show later, it loses its interstate character at this time. There is no difficulty in determining to a practical certainty how much current is thus "stepped down" and sold within the state of South Carolina, even though the high-voltage current brought into the state is run over the same wires that carry the current produced in the state. The current generated in South Carolina by the South Carolina Power Company and the current sold by it in that state are measured by its electric meters with absolute accuracy; and the method adopted in computing the tax on current brought in and sold is to add the total kilowatt hours coming into South Carolina (37,450,000) to the number generated in South Carolina (40,000,000); and from this total (77,450,000) compute the line loss (14,760,339 or 19 per cent.). This percentage of loss is applied on the current coming into the state which gives the line loss on this current (7,115,500). This is subtracted from the current brought into the state; and the result (30,334,500) represents the amount of current brought into the state and sold. It is objected that there is no average of transmission loss; but the method adopted would seem to be reasonably fair and accurate, as much so, at least, as most methods in use for computing taxes on the profits of business, which are universally upheld. If absolute accuracy in matters of this sort were necessary to the validity of taxes, most modern taxing systems would be found invalid.

Little need be said as to the point that the tax is levied for the benefit of private persons paying the general property tax, in that the statute provides that the proceeds of the tax for the year 1931 shall go to reduce the property levy for that year. Every tax levied, in theory at least, reduces other taxes. When a part of the public revenue is collected from excises, a smaller amount is required from the tax on property; and whether the Legislature, after providing for the collection of an excise, takes this into account and prepares to balance the budget by levying a smaller tax on property, or

whether, after making the levy on property, it provides that the revenue realized from an excise shall reduce that levy, is manifestly immaterial. In either event the amount raised by the excise is used for public purposes; and the fact that the property owner may have benefited by the levy of the excise because of the reduction of the taxes on property is no more material in the one case than in the other. A tax cannot be said to be levied for the benefit of private persons simply because, on account of the revenue to be derived from same, the Legislature has seen fit to lower the tax rate on their property. Whether a tax shall be raised or reduced, or whether revenue shall be raised by one system or by another, are matters committed necessarily to the discretion of the Legislature, with the exercise of which the courts cannot interfere.

Questions under the Commerce Clause.

█ The principal questions under the commerce clause of the Constitution (Const. U. S. art. 1, § 8, cl. 3) are based upon what is said to be the inherent nature of the generation and transmission of electric power. It is said that only so much power is generated as is needed to supply the user; that the whole system is so connected and regulated that, whether produced by water power or by steam, the generators produce only so much current as is called for at any given time by the use made of the current by the customer; that electricity travels at the rate of light, i. e., at the rate of 186,000 miles per second, with the result that current is generated and transmitted instantaneously to the customer when he signifies his need of it by turning on his light, motor, or other device using current; and that the transmission of current to the customer in interstate commerce must be treated, therefore, as generation and transmission in response to order, which the state cannot burden by taxation. The process of generation and transmission is thus described in the affidavit of Dr. Robert A. Millikan, one of the most distinguished physicists of the country:

"The terms 'generation,' 'manufacture' and 'production' as applied to energy in the electrical form are merely convenient designations applied to one aspect of the process of transferring energy from some source in nature (such as falling water) to some point where it may be usefully applied. The various electrical facilities used in said process are purely transferring devices, and the entire combined process,—electric, magnetic and mechanical,—is integral, continuous and essentially simultaneous, as electricity travels approximately with the speed of light—186,000 miles per second.

"There is a continuous electrical and electromagnetic path between the windings in the generator and the windings in the consumer's motor (or between the generator windings and the filament in an electric lamp or the electrodes in an electrochemical cell). The entire electric system is a device for transferring the force of the falling water to and applying it at the point where it is to be utilized. Except as, and to the extent that, energy is called for and used at the final point of utilization, the electric generator neither receives from the water wheel shaft nor delivers to the electric transmission lines any energy other than that necessary to hold the equipment under constant rotation and electric charge in instant readiness to serve. * * *

"In the commercial generation, transmission and distribution of electricity the process is essentially unchanged. Electricity generated at different stations may, for commercial convenience, reliability of service, and similar factors, be brought together at a single distributing station or substation, as it is sometimes called, from which point it is in turn distributed over different lines to consumers' different points of use. If no consumer is using power on any distribution line no demand is placed on the generators and no electricity is generated, except as above stated, that necessary to hold the equipment under rotation and electric charge. If the aggregate electrical demand of the various consuming devices of the different consumers is less than the capacity of the generators, that part of the generating equipment which is not required to serve the immediate present combined demands of the various consumers remains idle, or delivers only such power or electricity as is required to meet the combined demands of the consumers. Similarly, meters placed at the generating station, or at any point between the generating station or stations and the distributing substation, register the power output (subject to losses as they vary from point to point) required to meet the then total demands of all the consumers, and the duration of such aggregate total demands. They afford measurements of aggregate consumers' use as well as measurements of generation, because the two are correlative.

"The various processes involved in stepping up and stepping down electricity through transformers involve no change in

the essential nature of the electrical processes herein first above mentioned. They are merely devices adapted to the needs of the particular situation developed primarily with a view to efficiency and economy in operation. For illustration, electricity could be generated at 6600 volts and economically transmitted from the station for a distance of a few miles, and used by a consumer whose motors operated at that voltage without any process of transformation at either end of the circuit. This would probably be done under such conditions of transmission and use. But as distances of transmission increase, transmission at such a relatively low voltage involves either excessive size of conductors or excessive losses in transmission and the economic and practical thing to do is to step up the voltage (increase the pressure) for economy in transmission. The transformers, therefore, are merely an aid to the transfer or transmission of energy in the electrical form, or what we call electricity."

We think, however, that the argument of complainants ignores, or at least does not accord sufficient importance to, the part played by the transformer in the system of electrical transmission. Electricity is produced at a low voltage. For transmission over long distances it is "stepped up" by a transformer to a very high voltage; and all of the current transmitted in interstate commerce by complainants is thus "stepped up" before transmission in such commerce. Before it can be used by the consumer, it must be "stepped down" again to a low voltage; and all of the current received by complainants in interstate commerce is thus stepped down before being sold to or used by the consumer. And this "stepping up" or "stepping down" is not a mere change produced in the current. It is the production of a new and different current. The principle of the transformer is that the current flowing in the wires coming into the transformer sets up an induced current in the magnetic core of the transformer, and this causes an induced current to flow in the wires going out of the transformer; the voltage depending upon the relative number of the coils of the wires carrying the current in and those carrying the induced current out. These wires are insulated from each other, and the current going out is not the current coming in, but a new and different current, although induced by the former. Encyclopedia Britannica (14th Ed.) article "Transformers." The current produced by induction in the transformer results from the use of the original current but is not that current, just as current produced by steam results from the use of coal but is not the coal.

Now, so far as the production or generation tax on current is concerned, there can be no question as to its validity as applied to current transmitted in interstate commerce, we think, even though the current transmitted be conceived of as the identical current produced. The production of an article for transmission in interstate commerce is not in itself such commerce. United Leather Workers' International Union, Local Lodge or Union No. 66 v. Herkert, 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566; United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; Delaware L. & W. R. R. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397. And there can be no question but that such production is taxable by the state.

In Oliver Iron Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 529, 67 L. Ed. 929, the state of Minnesota had imposed a tax on the business of mining iron ore measured by a percentage of the value of the ore mined or produced. Substantially all of the ore when mined was loaded on cars and shipped into other states to satisfy existing contracts. In holding that the tax on production was not a burden on interstate commerce, though the ore was destined for transportation in such commerce even before it was mined, the court, speaking through Mr. Justice Van Devanter, said: "The ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining. No discrimination against interstate commerce is involved. The tax may indirectly and incidentally affect such commerce, just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference."

The same holding has been made with respect to the production tax on gas (Hope Natural Gas Co. v. Hall, 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049); a tax on coal prepared and "ready for shipment or market" and destined for a market in other states (Heisler v. Thomas Colliery Co., supra); and a manufacturing tax upon goods sold in interstate commerce (American Mfg. Co. v. St. Louis, 250 U. S. 459, 39 S. Ct. 522, 63 L. Ed. 1084).

The case of Hope Gas Co. v. Hall, supra, supporting the production tax on gas, would seem to be directly in point as supporting the tax here; for the gas in that case, just as the electricity here, was transmitted immediately

in interstate commerce. The fact that the gas went through pipes, whereas the electric energy is transmitted by wires, or that a longer time is required for the transmission of gas than is required for the transmission of electricity, or that gas is a material which is understood whereas electricity is a force which is not understood, would seem to make no difference with respect to the principle involved.

As pointed out above, however, it clearly appears that the current generated in South Carolina, upon which the tax is imposed, is not the current transmitted in interstate commerce. The current upon which the tax is imposed is the generated low-voltage current; the current transmitted in interstate commerce is the high-voltage current induced in the transformers of the company. The statute does not attempt to impose a tax upon this.

And we think it equally clear that the tax imposed upon the sale of current does not burden interstate commerce as to current brought from without the state. The tax is not imposed on the high-voltage current which passes in interstate commerce. It is imposed on the low-voltage current which is sold to the consumer, and is an excise tax on the business of selling that current. The high-voltage current which comes into the state is not sold. It is used to induce in the transformer the low-voltage current which is sold. Even if the current sold be considered as the current which is brought in, it has gone through a process in which it has been "broken up" or changed from one current of high voltage to many currents of low voltage; and it is these many currents of low voltage sold within the state upon the sale of which the tax is levied. While electric current can hardly be said to "come to rest" within a state, its interstate journey ends at the transformer which uses it for the production of low voltage currents for use within the state. The situation is the same in principle as the breaking up of an original package after shipment in interstate commerce [cf. Brown v. Maryland, 12 Wheat. 419, 443, 6 L. Ed. 678], or the breaking up of a cargo of oil after its interstate journey and the sending of it in tank cars to the points where needed within the state [Atlantic C. L. R. Co. v. Standard Oil Co., 275 U. S. 257, 48 S. Ct. 107, 72 L. Ed. 270; Atlantic C. L. R. Co. v. Standard Oil Co. (C. C. A. 4th) 12 F.(2d) 541, 60 A. L. R. 1456], or the distribution of gas in low pressure pipes after it has been brought into the state in high-pressure pipes

in interstate commerce. East Ohio Gas Co. v. Tax Commission of Ohio, 283 U. S. 465, 51 S. Ct. 499, 500, 75 L. Ed. 1171.

The case last cited is directly in point. There the state of Ohio had imposed a tax on the sale of gas within the state. A company brought in gas from other states in high pressure pipe lines. From these lines it was distributed to consumers by means of low pressure supply mains. The reduction of the current of gas from high pressure to low pressure for local use, while different mechanically, is the same from the standpoint of legal principle as the reduction of a high-voltage current to low voltage for local use. In sustaining the right of the state to impose the tax, the Supreme Court, speaking through Mr. Justice Butler, said: "The transportation of gas from wells outside Ohio by the lines of the producing companies to the state line and thence by means of appellant's high pressure transmission lines to their connection with its local systems is essentially national—not local—in character and is interstate commerce within as well as without that state. * * * But when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the producing companies, its volume thereby is expanded to many times what it was while in the high pressure interstate transmission lines, and it is divided into the many thousand relatively tiny streams that enter the small service lines connecting such mains with the pipes on the consumers' premises. So segregated the gas in such service lines and pipes remains in readiness or moves forward to serve as needed. The treatment and division of the large compressed volume of gas is like the breaking of an original package, after shipment in interstate commerce, in order that its contents may be treated, prepared for sale, and sold at retail. State v. Flannelly, 96 Kan. 372, 383-384, 152 P. 22; W. Va. & Md. Gas Co. v. Public S. Com., 134 Md. 137, 143-145, 106 A. 265. Cf. Atlantic Coast Line v. Standard Oil Co., 275 U. S. 257, 269, 48 S. Ct. 107, 72 L. Ed. 270; Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Leisy v. Hardin, 135 U. S. 100, 10 S. Ct. 681, 34 L. Ed. 128. It follows that the furnishing of gas to consumers in Ohio municipalities by means of distribution plants to supply the gas suitably for the service for which it is intended is not interstate commerce, but a business of purely local concern exclusively within the jurisdiction of the state."

■ The point that the tax on sales is a discrimination against current which has passed in interstate commerce, because current which has paid the local generation tax is exempted from the sales tax, has already been considered in discussing the points raised under the Fourteenth Amendment. The cases of Hinson v. Lott, supra, 8 Wall. 148, 19 L. Ed. 387, and Doscher v. Query, supra (D. C.) 21 F. (2d) 521, 525, sufficiently answer this position.

The Question of Federal Agency.

■ The South Carolina Power Company generates at its Stevens creek plant on the Savannah river the electric current which it brings into the state of South Carolina; and it argues that in maintaining the dam and plant at which the current is generated it is acting as an agency of the federal government in aid of navigation and is not taxable by the state upon the generation or sale of the current there produced. The same point is made by the Lexington Power Company, the plant of which is maintained upon the Saluda river. Both rivers are navigable streams, and both plants were constructed under licenses from the federal government, license being granted to the South Carolina Power Company by certain acts of Congress and to the Lexington Power Company by the Federal Power Commission. Both companies point, just as did the Susquehanna Power Company in the case recently decided by the Supreme Court (283 U. S. 291, 51 S. Ct. 434, 75 L. Ed. 1042), to the licenses granted them by the federal government, to the fact that their plants were constructed in accordance with plans required under their license and approved by officials of the government, to the provisions of law subjecting them to regulatory and supervisory powers of the government extending to construction, maintenance, operation, financing, rates, service, and accounting, and to the right of the government at the expiration of the license to take over and operate the property upon the payment of just compensation.

We cannot accept this contention. Complainants, in the production and sale of power, are not acting as agents of the government, but are engaged in private business for profit. To obtain licenses to build their dams in navigable streams, they have, it is true, consented to certain restrictions and conditions imposed by the government; but it does not follow that because of this they have made the private business in which they are engaged an instrumentality of the federal government and thus exempted it from taxa-

tion by the state. If a private business conducted for profit is to be exempted from taxation by one of our dual sovereignties because enjoying privileges granted subject to conditions by the other, most public service corporations would be able to escape either state or federal taxation. One had as well argue that a corporation enjoying the right of eminent domain under grant from the state is an agency of the state, and therefore not taxable by the federal government, as that a corporation holding a license to build a dam in a navigable stream is for that reason an agency of the federal government and not taxable by the state. It is unthinkable that corporations of a state, carrying on private business protected by its laws, should escape the payment of excise taxes imposed upon such business, merely because they enjoy a license from the federal government which authorizes them to use the navigable streams of the state.

If this were an attempt to tax the license granted by the federal government, to discriminate in taxation against companies holding a federal license, or to tax a structure erected in aid of navigation, a different question would, of course, be presented; but nothing of the sort is involved in the case. We have simply the taxation of the private business done by the company which falls upon it in the same manner as upon other companies engaged in like business whether they are licensed to make use of the navigable streams of the state or not. See 6 R. C. L. 105–107; Thomson v. Pacific Railroad, 9 Wall. 579, 19 L. Ed. 792; Henderson Bridge Co. v. Kentucky, 166 U. S. 150, 154, 17 S. Ct. 532, 41 L. Ed. 953; Baltimore Shipbuilding Co. v. Baltimore, 195 U. S. 375, 25 S. Ct. 50, 49 L. Ed. 242; Gromer v. Standard Dredging Co., 224 U. S. 362, 32 S. Ct. 499, 56 L. Ed. 801; Susquehanna Power Co. v. State Tax Commission of Maryland, supra, 283 U. S. 291, 51 S. Ct. 434, 435, 75 L. Ed. 1042. In the case last cited the Supreme Court, speaking through Mr. Justice Stone, laid down the principles which we think applicable here as follows:

"Assuming, for present purposes, that the license of the Power Commission is a federal instrumentality, immune from taxation or other direct interference by the state, it does not follow that the property appellant uses in its power project is clothed with that immunity. The exemption of an instrumentality of one government from taxation by the other must be given such a practical construction as will not unduly impair the taxing

power of the one or the appropriate exercise of its functions by the other. Metcalf & Eddy v. Mitchell, 269 U. S. 514, 523, 524, 46 S. Ct. 172, 70 L. Ed. 384.

"With that end in view, the distinction has long been taken between a privilege or franchise granted by the government to a private corporation in order to effect some governmental purpose, and the property employed by the grantee in the exercise of the privilege, but for private business advantage. The distinction was pointed out by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 436, 4 L. Ed. 579, and in Osborn v. Bank, 9 Wheat. 738, 867, 6 L. Ed. 204; see Union Pac. Railroad Co. v. Peniston, 18 Wall. 5, 34–37, 21 L. Ed. 787. It has been followed without departure, and property so owned and used has uniformly been held to be subject to state taxation."

Complainants attempt to distinguish the Susquehanna Power Case on the ground that the tax there involved was a tax on property and not an excise tax on business. We think, however, that this is a distinction without a difference. An excise tax on production or sales is in effect a tax on the property produced or sold. Kehrer v. Stewart, 197 U. S. 60, 25 S. Ct. 403, 49 L. Ed. 663; Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347. And if the state may tax the property of the company used in the production or sale of electric current, there is no reason why it may not tax the current itself or, what is the same thing, its production and sale; for one tax is as much a burden upon what is said to be an agency of the government as the other. Mr. Justice Stone says, in the Susquehanna Case, "the distinction has long been taken between a privilege or franchise granted by the government to a private corporation in order to effect some governmental purpose, and the property employed by the grantee in the exercise of the privilege, but for private business advantage"; and the same distinction in principle exists here between the privilege or franchise granted by the government, i. e. the right to erect a dam in a navigable stream, and the business carried on by the grantee for private advantage, i. e. the production and sale of electric current.

A point raised by the pleadings, but not stressed in the briefs, is that because of the franchise and income taxes already imposed by the state of South Carolina upon complainants, the tax in question violates the contract clause of the Constitution of the United States (article 1, § 10) and section 8 of article 1 of the Constitution of South Carolina. It is clear, however, that the taxing power of the state was not exhausted by the imposition of the taxes referred to; and the taxing of the business of complainants by the act here in question impaired the obligation of no contract existing between the state and complainants. See Citizens' Savings Bank v. Owensboro, 173 U. S. 636, 19 S. Ct. 530, 571, 43 L. Ed. 840, and cases there cited.

For the reasons stated, we think that the interlocutory injunction prayed for must be denied. We have been impressed with the earnest argument of counsel, who point to the heavy taxes already required of them, and complain that the statute here will add a grievous burden to their load. This, however, is a matter for the Legislature of the state and not for us. We can grant relief from a taxing statute only when it offends some constitutional provision; and, for the reasons stated, we cannot say that the statute here under consideration so offends.

Interlocutory injunction denied.