TOOMER et al. v. WITSELL et al.

No. 1804.

District Court, E. D. South Carolina, Charleston Division.

Sept. 13, 1947.

Robert E. Falligant, of Savannah, Ga., Thomas P. Bussey, of Charleston, S. C., and Phyllis Kravitch and Aaron Kravitch, both of Savannah, Ga., for petitioners.

John M. Daniel, Atty. Gen., T. C. Callison and J. Monroe Fulmer, Asst. Attys. Gen., and Robinson & Robinson, of Columbia, S. C., for defendants.

Before PARKER, Circuit Judge, and WYCHE and TIMMERMAN, District Judges.

PARKER, Circuit Judge.

This is a suit by certain citizens of Georgia and a Florida corporation, engaged in fishing for shrimp in the coastal waters off the shores of the States of North Carolina, South Carolina, Georgia and Florida, against the individuals composing the South Carolina State Board of Fisheries, to enjoin the latter from enforcing against plaintiffs the provisions of the South Carolina statutes with respect to fishing for shrimp in South Carolina waters. Plaintiffs do not fish within the inland waters of South Carolina but within and beyond the three mile maritime belt of the coastal waters. They contend that the statutes are void as applied to them on the following grounds: (1) that the State of South Carolina has no jurisdiction of the coastal waters beyond low water mark; (2) that the statutes make arbitrary discrimination between residents and non residents of South Carolina in violation of the Privileges and Immunities clause, Art. IV, sec. 2(1), of the Constitution and the Equal Protection clause of the Fourteenth Amendment; and (3) that the statutes impose a tax on imports and a burden on interstate commerce in violation of sections 8 and 10 of Art. I. Interlocutory injunction has been asked; a court of three judges has been convened pursuant to sec. 266 of the Judicial Code, 28 U.S.C.A. § 380; and the case has been heard upon the merits and submitted for final decree.

The facts are that each of plaintiffs is operating boats engaged in fishing for shrimp off the shores of the states above named. The shrimp spend the Winter and multiply in the inland waters of the states and in the Spring and Summer months move out into the coastal waters, where they migrate southward in the Fall and Winter and northward in Spring and Summer. Fishing for them in the inland waters of South Carolina is absolutely forbidden and regulation of the fishing within the three mile maritime belt is attempted by the statutes of which complaint is made. Sec. 3300 of the Code provides that these waters, as well as the inland waters, shall be "a common for the people of the State for the taking of fish". Sec. 3379 of the Code, as amended in 1947, imposes an annual license fee of $25.00 on boats engaged in shrimp fishing, if owned by residents of South Carolina, and of $2500.00, if owned by non residents, with provision that the license required of non residents be only $150.00 if they have operated boats in South Carolina during each of the preceding three years, but that not more than one hundred licenses be issued to non residents. Sec. 3374 imposes a tax of one-eighth cent per pound on green shrimp taken or "canned, shucked or shipped for market"; and sec. 3414 re-

quires all boats licensed to trawl for shrimp in the waters of the state to "unload their catch of shrimp, and pack and properly stamp the same before shipping or transporting it to another State or the waters thereof". Violation of this provision is punishable by a fine of $500.00 or one year's imprisonment or both. Sec. 3407 provides punishment of $1,000.00 fine or six months imprisonment for other violations of the article regulating fisheries for which specific punishment is not otherwise provided.

▮ Preliminary questions have been raised as to the jurisdiction of the court and as to whether injunctive relief is appropriate. It is clear, however, that there is diversity of citizenship and that the cause of action asserted by plaintiffs arises under the Constitution of the United States. Plaintiffs cannot bring themselves within the $150.00 license provision, and as to one or more of them the license fees which they will be required to pay under the act will amount to $5,000.00 or more. If they should not pay the license, the criminal penalties which they would incur by unlicensed trawling would make it impossible for them to continue trawling in South Carolina waters, and this would involve loss of business for a number of the plaintiffs in excess of $3,-000.00 annually. There is no provision for payment of the license tax under protest and suit for its recovery; and it is clear that, if plaintiffs' contention as to the invalidity of the statutes is correct, they are threatened with irreparable injury and have no adequate remedy at law of which they may avail themselves. Ex parte Young, 209 U.S. 123, 155, 162, 28 S.Ct. 441, 52 L. Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764; Kennington v. Palmer, 255 U.S. 100, 41 S.Ct. 303, 65 L.Ed. 528; Terrace v. Thompson, 263 U.S. 197, 214, 44 S.Ct. 15, 68 L.Ed. 255; Packard v. Banton, 264 U.S. 140, 143, 44 S.Ct. 257, 68 L.Ed. 596. The statutes involved are clear and there is no such need for interpretation or other special circumstances as would warrant the Court in staying action pending proceedings in courts of the state, as was held proper in American Federation of Labor, Metal Trades Dept. v. Watson, 327 U.S. 582, 595, 599, 66 S.Ct. 761, 90 L.Ed. 873.

▮ Defendants point to the fact that certain of plaintiffs have been found guilty of criminal violation of the statutes and say that in proper application of the clean hands doctrine they should not be heard by a court of equity. It is well settled, however, that courts of equity "do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication. Story, id., § 100. Pomeroy, id., § 399. They apply the maxim, not by way of punishment for extraneous transgressions, but upon considerations that make for the advancement of right and justice. They are not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion". Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 246, 54 S.Ct. 146, 147, 78 L.Ed. 293; Mas v. Coca Cola Co., 4 Cir., 163 F.2d 505. The matter involved in suit here is the constitutionality of the statutes complained of by plaintiffs, and neither this question nor the equitable relationship of the parties could possibly be affected by plaintiffs' disobedience of the statutes; and, at all events, the matter is one resting in our discretion, and we should not exercise that discretion to refuse a hearing to one who complains that state legislation affecting others as well as himself is violative of rights guaranteed by the Constitution of the United States.

▮ We come then to the principal question in the case, which is whether the statutes are void on the ground that the state has no such jurisdiction over the coastal waters within the three-mile maritime belt as would support such legislation. The question is raised because of the recent decision of the Supreme Court in United States v. State of California, 67 S.Ct. 1658; but, for reasons hereinafter set forth, we do not regard that decision as controlling, in the absence of any assertion of rights by the federal government. The power of the states over such waters and the fishing rights in them is well settled by a long line of decisions, and we do not understand that

it was intended by the decision in the California case to overrule these or to question in any respect the law as declared by them. On the contrary the Court was at great pains in the California case to distinguish the cases which dealt with the power of the states over fishing in coastal waters.

The right of the state to control the fish running in tide waters was laid down in an opinion by Chief Justice Waite in McCready v. State of Virginia, 94 U.S. 391, 394, 24 L.Ed. 248, as follows:

"The principle has long been settled in this court, that each State owns the beds of all tide-waters within its jurisdiction, unless they have been granted away. Pollard's Lessee v. Hagan, 3 How. 212 [11 L.Ed. 565]; Smith v. [State of] Maryland, 18 How. [71], 74 [15 L.Ed. 269]; Mumford v. Wardwell, 6 Wall. [423], 436 [18 L.Ed. 756]; Weber v. [Board of] Harbor Commissioners, 18 [Wall. 57], 66 [21 L.Ed. 798]. In like manner, the States own the tidewaters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the State represents its people, and the ownership is that of the people in their united sovereignty. Martin v. Waddell, 16 Pet. [367], 410 [10 L.Ed. 997]. The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States. There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the State, which has consequently the right, in its discretion, to appropriate its tide-waters and their beds to be used by its people as a common for taking and cultivating fish, so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the State thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship."

That this right over fisheries applies within the three mile maritime belt and not merely to inland waters was laid down un-equivocally in Manchester v. Commonwealth of Massachusetts, 139 U.S. 240, 11 S. Ct. 559, 562, 35 L.Ed. 159, where, however, the precise question related to the control of fishing in Buzzard's Bay. The Court said:

"Therefore, if Massachusetts had continued to be an independent nation, her boundaries on the sea, as defined by her statutes, would unquestionably be acknowledged by all foreign nations, and her right to control the fisheries within those boundaries would be conceded. The limits of the right of a nation to control the fisheries on its seacoasts, and in the bays and arms of the sea within its territory, have never been placed at less than a marine league from the coast on the open sea; and bays wholly within the territory of a nation, the headlands of which are not more than two marine leagues, or six geographical miles, apart, have always been regarded as a part of the territory of the nation in which they lie. * * * We do not consider the question whether or not congress would have the right to control the menhaden fisheries which the statute of Massachusetts assumes to control; but we mean to say only that, as the right of control exists in the state in the absence of the affirmative action of congress taking such control, the fact that congress has never assumed the control of such fisheries is persuasive evidence that the right to control them still remains in the state."

In State of Louisiana v. State of Mississippi, 202 U.S. 1, 52, 26 S.Ct. 408, 422, 50 L. Ed. 913, relating to a complicated boundary dispute between the states named, Chief Justice Fuller stated the rule as follows, citing McCready v. State of Virginia and Manchester v. Commonwealth of Massachusetts, viz.:

"The maritime belt is that part of the sea which, in contradistinction to the open sea, is under the sway of the riparian states, which can exclusively reserve the fishery within their respective maritime belts for their own citizens, whether fish, or pearls, or amber, or other products of the sea."

Directly in point is The Abby Dodge v. United States, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390. That case involved a federal statute prohibiting a certain type of sponge

fishing in the Gulf of Mexico or straits of Florida. The court construed the statute as not having relation to waters within the maritime belt on the ground that fishing there was subject to the control of the state. Directly in point, also, is the case of Skiriotes v. State of Florida, 313 U.S. 69, 61 S.Ct. 924, 928, 85 L.Ed. 1193, which dealt with a statute of Florida which forbade the use of diving equipment for the purpose of taking commercial sponges within the maritime belt as defined by Florida law. Holding that the statute was a valid exercise of state power and that there was no conflict with a federal statute limiting the size of sponges which might be taken outside state territorial limits, the court said:

"According to familiar principles, Congress having occupied but a limited field, the authority of the State to protect its interests by additional or supplementary legislation otherwise valid is not impaired. * * * It is also clear that Florida has an interest in the proper maintenance of the sponge fishery and that the statute *so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, is within the police power of the State."* (Italics supplied).

It is worthy of note that, in the case of United States v. State of California, supra, the Supreme Court quoted from the case of Skiriotes v. State of Florida, italicizing the language which we have italicized in the above quotation. All four of the cases which we have cited were cited by the Supreme Court and distinguished in the California case; and there was no suggestion that they were being overruled. The California case held that the state was not the owner of the land under the ocean within the maritime belt, and that it could not claim the oil to be derived therefrom against the claim of the United States; but the established doctrine that the state might exercise police power over the maritime belt and control fishing therein was not questioned in the opinion or affected in any way by the decision. It is clear that very different considerations should govern the decision as to who is to exercise police power over the marginal seas, which can easily be used to interfere with law enforcement on land, or as to who is to control fishing in areas which mean so much to the support of large numbers of people who live near the sea, from those which should govern as to who is to control in the maritime belt the oil to be secured from the land under the ocean, a matter which could easily lead to international controversy. The United States has asserted its paramount authority with respect to oil, but no such authority with respect to fish or fishing; and we see no reason why we should not follow the well settled line of decisions which hold that, in the absence of action by the federal government, the power as to these rests in the several states. If these decisions are to be overruled, the matter is one for the Supreme Court and not for us.

Plaintiffs contend that until the enactment of the fisheries law of 1924 no authority was asserted by the State of South Carolina over the maritime belt and that it was not within the boundaries of the state as set forth in the statute defining them. Code sec. 2038. An examination of the statute, however, shows that the boundary on the east is given as the Atlantic Ocean; and there is nothing in this inconsistent with the intent to exercise authority over the maritime belt in accordance with what is customary under the law of nations. Even if there were, it is elementary that acts of a legislature do not limit the power of future legislatures; and there is no reason why the legislature of 1924 should not exercise the power which under the law of nations and the decisions of the Supreme Court was unquestionably possessed by the state.

We come, then, to the second point made by plaintiffs, i. e., that the discrimination between residents and non residents in the amount of the license fee exacted is violative of the Privileges and Immunities clause of Article IV of the Constitution and the Equal Protection clause of the Fourteenth Amendment. It is well settled, however, that these constitutional provisions do not require the state to accord equality of treatment to non residents and residents with respect to the taking of fish or animals ferae naturae, the ownership of which is in.

the state for the benefit of its inhabitants. Geer v. State of Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793; Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244; Patsone v. Commonwealth of Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539; Haavik v. Alaska Packers' Association, 263 U.S. 510, 44 S.Ct. 177, 68 L.Ed. 414; Lacoste v. Department of Conservation, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437; In re Eberle, C.C., 98 F. 295; Anderson v. Smith, 9 Cir., 71 F.2d 493; Commonwealth v. Hilton, 174 Mass. 29, 30, 54 N.E. 362, 363, 45 L.R.A. 475, 478. In the case last cited the rule applicable is stated by the Supreme Judicial Court of Massachusetts as follows:

"It is now settled that the right of regulation and control of fisheries by the several states in the interest of the public permits, in any state, legislation that secures the benefits of this public right in property to its own inhabitants. The rights, immunities, and privileges which are secured by the constitution of the United States to the inhabitants of the several states do not include, in favor of inhabitants of any state, rights in common property of the inhabitants of other states. McCready v. [State of] Virginia, 94 U.S. 391 [24 L.Ed. 248]; Wharton v. Wise, 153 U.S. 155, 14 S.Ct. 783 [38 L.Ed. 669]; Corfield v. Coryell, Fed.Cas.No. 3,230, 4 Wash.C.C. 371; Blake v. McClung, 172 U.S. 239–249, 19 S.Ct. 165 [43 L.Ed. 432–436]."

In the language of Mr. Justice Holmes in Patsone v. Commonwealth of Pennslyvania, supra [232 U.S. 138, 34 S.Ct. 283], "It is to be remembered that the subject of this whole discussion is wild game (shrimp), which the state may preserve for its own citizens if it pleases." The benefit to be derived from these shrimp, produced in the inland waters of the state and constituting a valuable source of food and income for large numbers of its people, will be largely lost if out of state fishing boats are allowed to prey upon them without let or hindrance. It is unquestionably within the power of the state, as a proper conservation measure, to require of out of state fishermen a license fee so high as to limit their number and to reimburse the people of the state in some measure for the loss sustained by them from the fishing of those who are licensed.

Plaintiffs rely upon Pavel v. Richard, D.C., 28 F.Supp. 992; but that case is not in point. What was there decided was the special case that a non resident land owner who used his property for raising fur bearing animals was denied the equal protection of the laws by a statute which imposed disproportionate license fees on non resident trappers with whom he had entered into contracts to trap on the property. The general rule that the state may exact higher license fees of non resident hunters and fishermen than of residents and may even exclude non residents from taking fish and game within the state was not considered and no indication was given of any intent to depart from it. If the case could be so interpreted, we should think it not well decided.

There is nothing in the importation or interstate commerce points. With the decision as to the power of the state over fishing in the maritime belt, the whole basis of the importation point goes out of the case. As to interstate commerce, the requirement that the shrimp destined for out of state shipment be stamped and properly packed is a proper regulatory provision. It has reasonable relation not only to maintaining the good reputation of products originating in the state but also to insuring the collection of the one-eighth cent per pound tax, which in the absence of some such requirement could be easily evaded on shrimp shipped out of the state. It is too well settled to admit of argument that a state may regulate the export of articles in which it has a special property, such as wild game or fish, even if interstate commerce be indirectly affected by the restriction. Geer v. State of Connecticut, supra; Rupert v. United States, 8 Cir., 181 F. 87; State v. Harrub, 95 Ala. 176, 10 So. 752, 15 L.R.A. 761, 36 Am.St.Rep. 195; McDonald & Johnson v. Southern Express Co., C.C., 134 F. 282; 22 Am.Jur. p. 697; Note 32 A.L.R. 336 et seq., and cases there cited. It is equally well settled that a tax on articles produced within a state will be sustained, even though they be intended for

interstate shipment, where, as here, the tax does not discriminate against interstate commerce and interstate transportation has not commenced. Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Heisler v. Thomas Colliery Co., 260 U.S. 245, 258, 43 S.Ct. 83, 67 L.Ed. 237; Hope Natural Gas Co. v. Hall, 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049; Ohio Oil Co. v. Conway, 281 U.S. 146, 50 S.Ct. 310, 74 L.Ed. 775; South Carolina Power Co. v. South Carolina Tax Commission, D.C., 52 F.2d 515; Id., 286 U.S. 525, 52 S.Ct. 494, 76 L.Ed. 1268; Id., D.C., 60 F.2d 528; Broad River Power Co. v. Query, 288 U.S. 178, 53 S.Ct. 326, 77 L. Ed. 685. Since the tax on shrimp here involved was levied without discrimination against interstate commerce, it was valid; and the requirement for packing and stamping was valid as a proper means of preventing tax evasion. It was proper, also, because of the special property of the people of South Carolina in the shrimp taken within the state.

Argument is made that the tax and requirement for fishing and stamping are invalid because applicable to shrimp caught beyond as well as to those caught within the three mile limit. It would be entirely impractical, however, to differentiate between shrimp taken within and without the limit; and those who avail themselves of the privilege of fishing within the limit are properly required to report their entire catch, since otherwise the reasonable provisions of the statute would be unenforceable. See Mirkovich v. Milnor, D.C., 34 F. Supp. 409; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S.Ct. 513, 515, 80 L.Ed. 772. In the case last cited, where complaint was made that a California statute applied to fish taken beyond the waters over which the state had jurisdiction, the Court said:

"Sardines taken from waters within the jurisdiction of the state and those taken from without are, of course, indistinguishable; and to the extent that the act deals with the use or treatment of fish brought into the state from the outside, its legal justification rests upon the ground that it operates as a shield against the covert depletion of the local supply, and thus tends

to effectuate the policy of the law by rendering evasion of it less easy. People of State of New York ex rel. Silz v. Hesterberg, 211 U.S. 31, 39, 40, 29 S.Ct. 10, 53 L.Ed. 75."

Plaintiffs place great reliance upon Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147, where the Supreme Court held invalid a state statute which forbade the exportation of shrimp from which head and hulls or shells had not been removed. No such unreasonable interference with interstate commerce is involved in the statute before us. That the case relied on has no application sufficiently appears from the analysis made of it in Bayside Fish Flour Co. v. Gentry, supra, where the Court said:

"Appellant places great reliance upon Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147. There an act of the state of Louisiana forbade exportation of shrimp from which the heads and hulls or shells had not been removed. The ostensible purpose of the act was to conserve the raw shells for local use. The bill and affidavits in support of it, however, demonstrated, we held, that this purpose was feigned, and that the real purpose was to prevent the shrimp from being moved as theretofore from Louisiana to a point in Mississippi, where they were packed or canned and sold in interstate commerce, and thus through commercial necessity to bring about the removal of the packing and canning industries from Mississippi to Louisiana. The Louisiana act authorized every part of the shrimp to be shipped and sold in interstate commerce. We held that the state might have retained the shrimp for use and consumption therein; but, having fully permitted shipment and sale outside the state, those taking the shrimp under the authority of the act became entitled to the rights of private ownership and the protection of the commerce clause. It is plain that the decision has no application to the case under review."

For the reasons stated, we think that the injunction applied for should be denied and that the case should be dismissed.

Injunction denied and case dismissed.